969 P.2d 1168

**STATE of Arizona, Appellee.**

v.

**Eugene Allen DOERR, Appellant.**

No. CR–96–0679–AP.

Supreme Court of Arizona,
En Banc.

Nov. 12, 1998.

Grant Woods, Attorney General, Phoenix by Paul McMurdie, Ginger Jarvis, and Joseph T. Maziarz, for Appellee.

Dean W. Trebesch, Maricopa County Public Defender, Phoenix by Carol A. Carrigan and James H. Kemper, for Appellant.

## OPINION

ZLAKET, Chief Justice.

¶ 1 At approximately 10:00 a.m. on September 24, 1994, two Phoenix police officers responded to a "check welfare" dispatch following a 911 call. Upon arriving at a bungalow-style apartment, they found the front door ajar and a disheveled Eugene Doerr sitting on the coffee table in the living room. He wore only shorts and was covered with blood.

¶ 2 When asked what had occurred, Doerr replied: "I don't know. I woke up with this——with a dead body back there." In a bedroom doorway, Officer Wirth found a naked woman lying in a pool of blood. Detecting no pulse, he instructed his partner to radio the fire department. Doerr responded, "[Y]ou don't need fire because she's dead." He told the officers that he had awakened, gone to the bathroom, and found the body on the floor. He denied knowing the victim's identity.

¶ 3 The four-room apartment showed signs of a violent struggle, with blood in every room. At trial, the medical examiner

testified that the victim, 39–year–old Karen Bohl, died of multiple blunt force trauma. She suffered numerous injuries to the head, including a fractured nose, abrasions, cuts, bruises, and a two-inch laceration that exposed her skull. Her left hand was swollen and red. Her right hand was clenched in a fist holding hairs consistent with her own. Her left nipple and areola had been cut off, and above her right nipple were small lacerations. The body was covered in blood and fecal matter. Blood also formed a V-shaped pattern down her back from saturated hair.

¶ 4 The victim had been assaulted vaginally and rectally with an instrument of some kind. The doctor testified that the wall between her rectum and cervix had been destroyed. A bloody pipe, apparently part of a broken lampstand, and a bloody broom handle were found nearby—objects that the medical examiner said could have produced the injuries. Because of significant blood loss, swelling, and bruising, the doctor concluded that the injuries likely occurred prior to or during the victim's death. There were twenty-six other areas of injury to her body. Her blood alcohol level tested at .25, but no other drugs were detected. Tests for semen were negative.

¶ 5 Defendant Doerr was also injured. His right hand was swollen, and he had minor cuts on his forearm, above his wrist, and on his left foot. His chest, stomach, pubic area, and hands were smeared and caked with blood.

¶ 6 Investigators performed enzyme tests on the blood collected at the scene. The state's criminalist testified that Karen Bohl's PGM subtype was $1+2+$ and Eugene Doerr's was $1+1+$. He found blood consistent with only those two subtypes on numerous objects throughout the apartment. The pipe was saturated in blood of both subtypes, and the broom handle showed $1+1+$ on the base and $1+2+$ at the other end. The victim's bloody footprint was found on a bathtub. Bloody fingerprints belonging to both Bohl and Doerr were recovered from various locations around the apartment.

¶ 7 Defendant, a construction worker, had dined with his boss the evening before the murder. Around 8:30 p.m., he left in a company truck to purchase supplies for the next day's job. A receipt showed that he paid for the materials, including thirty-six bags of Redimix cement, at 9:05 p.m. He told the investigating officers that he then went to a bar and later stopped at the house of someone named Jeff. Finally, he went home. The next morning he awoke to find Bohl's body in his apartment and called 911 from the truck's mobile phone.

¶ 8 Defendant first claimed that he had no idea how the woman got there. Later, as officers waited for a search warrant, he told them that he thought her purse and ID were in the bathroom "because I remember seeing a purse and I don't own a purse." He also said the white car parked out front belonged to the victim. "That is her car she said . . . I think." One of the officers testified that Doerr hesitated before adding the "I think."

¶ 9 Doerr voluntarily went to the police station. During questioning, he asked one of the officers if he thought a judge would give him life for the murder. He also said, "[S]he must have really made me mad for me to do something to her like this." The police did not test Doerr for drugs or alcohol until about 3:00 p.m., five hours after the 911 call. The tests were negative.

¶ 10 Tina Allgeir last saw her sister, Karen Bohl, at about 4:30 p.m. on the previous day, when Karen dropped off her 7–year–old daughter before going to work. Bohl had just started a new job as a manager trainee at a fast food restaurant. Her supervisor reported that she had called to say she would be late. However, she never arrived at work. When she later failed to pick up her daughter, Allgeir and other family members went to Bohl's apartment. They found her work uniform there, and food was still on the stove. Police investigators were unable to determine where or when Bohl and the defendant met on the day of the murder. They also did not find any indication that the two had been previously acquainted.

¶ 11 While in custody, the defendant initially told his cellmate, Victor Rosales, that he did not remember anything about the incident. However, a few weeks later he recalled picking up Bohl, going on a "party-

ing binge," and arguing with her. Rosales testified that Doerr "flew off the handle" because descriptions contained in police reports were not "the way it happened." For instance, the defendant told Rosales that he struck the victim with a pipe when she started screaming, and not with a lamp as a police report indicated.

¶ 12 According to Rosales, Doerr wanted to have sex with Bohl, but she refused. Defendant reportedly stated, "[U]sually when you go pick out a woman, pick up a broad at a bar and take her partying, she knows what is expected." Rosales further testified that Doerr said "he should have buried the bitch in the back yard" with the cement he had purchased. Rosales claimed that he distanced himself from Doerr after the latter described the sensation he experienced from playing with the victim's blood.

¶ 13 At trial, defense counsel suggested that a third party could have entered the apartment, murdered the victim, and injured the defendant. Investigators, however, testified that the apartment windows were locked. Some, in fact, were painted shut. The front door was open when police arrived, but the back door was locked. No blood was found outside the apartment, except for a smear on the driver's side of the defendant's truck. Its location was consistent with the defendant's account of using the truck's mobile phone to call 911.

¶ 14 A jury convicted Doerr of premeditated first degree murder, felony murder, sexual assault, and kidnapping. Following a presentence hearing, the trial judge found the heinous, cruel, or depraved aggravator, A.R.S. § 13–703(F)(6), and insufficient mitigation to warrant leniency. He sentenced the defendant to death. This automatic appeal followed. We have jurisdiction pursuant to Ariz. Const. art. VI, § 5(3), A.R.S. § 13–4031, and Ariz. R.Crim. P. 31.2(b).

## TRIAL ISSUES

### Tainted Jury Pool

¶ 15 Defendant contends that the jury was irreparably tainted by the statements of two potential jurors during voir dire. The first, Joe Collier, had once directed the Phoe-

nix Crime Lab. Collier indicated that he could not be fair and impartial because he knew several of the state's witnesses. He identified by name Detective Dennis Olson, who was seated at the prosecutor's table and had been previously introduced to the jury panel. When asked by the court about his ability to sit as a juror, Collier said: "I don't think it would be fair to the defense, Your Honor, because of—I am aware of the integrity and I highly respect a number of the people that would be witnesses."

¶ 16 The second prospective juror, Jose Martinez, was a prison guard in the federal system. He volunteered that during his four and one half years on the job, he had encountered only three inmates who were not guilty. The judge excused both Collier and Martinez for cause. Defendant later moved for a mistrial, alleging that the entire panel had been prejudiced by their remarks. The court denied the motion.

¶ 17 On the second day of voir dire, the defense claimed that it had objected to Collier's presence on the panel in a conversation with the judge outside the courtroom before jury selection began. However, the record contains no evidence of this challenge as required by Ariz. R.Crim. P. 18.4(a). Defense counsel also did not move to strike the panel when Collier made his statements, but only called for a mistrial the following day.

¶ 18 The issue before us, then, is whether the court should have granted the formal mistrial motion because the remarks of these two panelists tainted the remaining jurors. *See State v. Greenawalt,* 128 Ariz. 150, 167, 624 P.2d 828, 845 (1981) ("An accused has a constitutional right to be tried by a fair and impartial jury."). Defendant merely speculates that this contamination occurred. We will not, however, indulge in such guesswork. *See State v. Tison,* 129 Ariz. 526, 535, 633 P.2d 335, 344 (1981) ("Unless there are objective indications of jurors' prejudice, we will not presume its existence."); *see also State v. Reasoner,* 154 Ariz. 377, 384, 742 P.2d 1363, 1370 (App.1987) (appellant had burden of showing that remarks of excused juror prejudiced others); *State v. Davis,* 137 Ariz. 551, 558, 672 P.2d 480, 487

(App.1983) (court will not assume that panel was prejudiced).

¶ 19    Defendant points to a recent Ninth Circuit decision in which a prospective juror's remarks were found to have tainted an entire panel. *See Mach v. Stewart,* 137 F.3d 630, 632–33 (9th Cir.1997). The facts of that case, however, are clearly distinguishable. *Mach* involved charges of sexual conduct with a minor. The prospective juror had worked many years with sexual assault victims and stated, in response to lengthy questioning, that "she had never known a child to lie about sexual abuse." *Id.* at 633. The court concluded that this individual's statements were "expert-like," dealt with material issues of the defendant's guilt and the victim's truthfulness, were delivered with certainty, and were repeated several times. As a result, the court concluded that they probably tainted at least one of the jurors. *Id.* at 633.

¶ 20    The panelists' remarks here do not rise to such a level. A review of the voir dire transcript reveals nothing suggesting that others were prejudiced. Collier merely acknowledged his own bias. His statements cannot reasonably be considered inflammatory, and he did not comment on the defendant's guilt or innocence. *Cf. Paschal v. United States,* 306 F.2d 398, 399–400 (5th Cir.1962) (holding that jury should have been dismissed when juror with special knowledge stated conclusion about the defendant's guilt in presence of entire panel).

¶ 21    Although Collier identified Detective Olson by name, nothing indicates that the jurors permitted his remark to affect their deliberations in any way. *See State v. Duffy,* 124 Ariz. 267, 274, 603 P.2d 538, 545 (App. 1979) (finding "too remote and speculative" the possibility that a comment by a prospective juror influenced others). The same may be said of Martinez' statements, which clearly exhibited a personal and biased viewpoint.

¶ 22    The judge considered Collier's remarks "gratuitous" and indicated that he could correct any error with jury instructions. He observed that Martinez' "demeanor was questionable," and did not think "the other jurors would have much stock in the manner in which he made the statement."

Although the court did not specifically admonish the jury to ignore either man's comments (in large part because defense counsel feared "ringing the bell twice"), he did instruct the jurors that they should determine the facts "only from the evidence produced here in court."

¶ 23    We observe that the trial judge might have exercised more caution in questioning Collier, who was well known to the court from his lengthy tenure with the crime lab. This prospective juror's familiarity with many of the state's witnesses was no secret. The court could have anticipated that Collier would likely be excused for cause. Because the potential for inappropriate remarks during voir dire clearly existed, we believe the safer practice would have been to excuse Collier before any questioning, or at least to interview him privately. Nevertheless, we find no evidence of prejudice. Collier's comments were brief and isolated in a lengthy voir dire involving seventy-five individuals over two days. The judge was in the best position to assess their impact on the jurors. We see no error in his refusal to declare a mistrial and replace the entire panel.

¶ 24    Defendant also claims that Collier's remarks vouched for the state's witnesses and violated his right to counsel by effectively precluding cross-examination of them. "Two forms of impermissible vouching exist: (1) when the prosecutor places the prestige of the government behind its witness, and (2) where the prosecutor suggests that information not presented to the jury supports the witness's testimony." *State v. Dumaine,* 162 Ariz. 392, 401, 783 P.2d 1184, 1193 (1989). Defendant argues that because Collier had directed the city crime lab, his remarks unfairly bolstered the credibility of the state's witnesses. Collier, however, was neither a prosecutor nor a witness. His remarks could not constitute impermissible vouching. Moreover, we do not see how his statements "precluded the defense from cross-examination of almost all of the State's witnesses." Finally, the defendant did not demonstrate that the jurors placed any stock in Collier's opinion, or that it compromised or impaired their ability to assess the evidence independently.

## Opinion Testimony

■ ¶ 25 On cross-examination, the defense elicited testimony from police officer Charles Gregory that he did not believe the defendant was truthful during questioning on the day of the arrest. On redirect, the following exchange with the prosecutor took place:

> PROSECUTION: You stated on cross-examination that you felt that the defendant was being untruthful with you. Can you tell us why you believe that?
>
> DEFENSE COUNSEL: Objection. Relevance, speculation.
>
> PROSECUTION: I believe the door was opened, Judge.
>
> THE COURT: Overruled.
>
> WITNESS: That he was being truthful with me?
>
> PROSECUTION: That he was being untruthful with you.
>
> WITNESS: That's correct.
>
> PROSECUTION: Why did you believe that he was being untruthful with you when he said that he didn't know what had occurred?
>
> WITNESS: The injuries that he had. When he slipped and told me that she said it was her car, and then changed it around real quick. The comments he made to me in the basement about whether or not he thought the judge would give him life in prison, and that she must have really made him made [sic] for him to do what happened to her.

Defendant claims that this testimony intruded on the jury's duty to determine the ultimate issue in the case. It was, he says, "tantamount to expert evidence on the question of guilt or innocence."

¶ 26 Lay witnesses may give opinion testimony, even as to the ultimate issue, when it is "rationally based on the perception of the witness and ... helpful to a clear understanding of the witness' testimony or the determination of a fact in issue." Ariz. R. Evid. 701; *see also State v. Koch*, 138 Ariz. 99, 102, 673 P.2d 297, 300 (1983); *State v. Ayala*, 178 Ariz. 385, 387, 873 P.2d 1307, 1309 (App.1994). One witness may not, however, state an opinion as to the credibility of another. *See State v. Lindsey*, 149 Ariz. 472, 475, 720 P.2d 73, 76 (1986); *State v. Moran*, 151 Ariz. 378, 382, 728 P.2d 248, 252 (1986); *State v. Reimer*, 189 Ariz. 239, 241, 941 P.2d 912, 914 (App.1997); *State v. Schroeder*, 167 Ariz. 47, 50–51, 804 P.2d 776, 779–80 (App.1990). Here, Officer Gregory's opinion was not intended as a comment on the defendant's credibility as a witness. Indeed, Doerr did not testify at the trial. Moreover, the detective was not speaking as an expert witness on truthfulness. He was merely stating his reasons for not believing the defendant's story.

¶ 27 In any event, the defense opened the door to this testimony. One cannot "complain about a result he caused." Morris K. Udall et al., *Law of Evidence* § 11, at 11 (3d ed.1991). The rule of invited error applies when a party elicits evidence or comments that "make otherwise irrelevant evidence highly relevant or require some response or rebuttal." *Pool v. Superior Court*, 139 Ariz. 98, 103, 677 P.2d 261, 266 (1984); *see also State v. Wilson*, 185 Ariz. 254, 259, 914 P.2d 1346, 1351 (App.1996) (observing that the response must be "pertinent").

¶ 28 Here, the overall tone of the cross-examination suggested that Officer Gregory had deliberately expressed disbelief regarding the defendant's story as a ploy to induce, by intimidation or otherwise, a confession or a material inconsistency. The cross-examination also implied that the police had improperly failed to look for an assailant other than the defendant. Officer Gregory's testimony on redirect explained why the police did not believe the defendant and did not do more to pursue another perpetrator. Under the circumstances, these reasons became relevant, and the state was entitled to explore them.

## "In Life" Photograph

¶ 29 Defendant objected at trial to an enlarged photograph of the victim taken while she was alive. The admissibility of "in life" photographs in a murder case is a matter of first impression for this court. A majority of jurisdictions "that have considered the admissibility of 'in life' photographs have also upheld their admission." *State v.*

*Broberg,* 342 Md. 544, 677 A.2d 602, 607 (1996) (citing jurisdictions so holding). Many of these courts have applied an analysis similar to that which we have utilized with respect to other types of photographic evidence. *Id.* First, the trial judge must decide if the photograph is relevant. *See State v. Amaya–Ruiz,* 166 Ariz. 152, 170, 800 P.2d 1260, 1278 (1990). Evidence is relevant if it assists the jury in understanding an issue in dispute. *Id.* The next consideration is whether the photograph has a tendency to inflame or incite passion in the jurors. *Id.* If it does, then the court must balance the photograph's probative value against its prejudicial effect. *Id.; see also* Ariz. R. Evid. 403.

¶ 30 Relevance is the crucial first step. Karen Bohl's identity was never at issue here. The defense did not contest it. There was ample testimony and other physical evidence to establish it. Nevertheless, the state argued that because the victim was so badly beaten, "[t]he jury has a right to see what she looked like before. They have a right to see what kind of damage [the defendant] did to her." The extent of Bohl's injuries, however, had been plainly demonstrated by other evidence. *See People v. Stevens,* 76 N.Y.2d 833, 560 N.Y.S.2d 119, 559 N.E.2d 1278, 1279 (1990) (disapproving of the use of "in life" photos as part of a "before-and-after" comparison with autopsy photos unless relevant to a material fact at issue).

¶ 31 The photo in question is part of a color snapshot taken at an unspecified time before the victim's death. In it, she is outside and her windblown hair partially obscures her face. The cropped photo was enlarged to 11 × 11 inches by a color copier. We fail to see how this exhibit provided much, if any, assistance to the jury in deciding the case. *See State v. Chapple,* 135 Ariz. 281, 288, 660 P.2d 1208, 1215 (1983) (holding that admissible photographs must have a "tendency to prove or disprove any question which is actually contested," either expressly or implicitly).

¶ 32 It can, of course, be argued that "in life" photos personalize the victim and help to complete the story for the jurors. *See State v. Scales,* 518 N.W.2d 587, 593 (Minn.

1994). The obvious danger is that such photos can also be used to generate sympathy for the victim and his or her family, thereby undermining the defendant's right to an objective determination of guilt or innocence. We do not believe that such damage occurred here, and we are unwilling to adopt an inflexible rule that "in life" photographs are always inadmissible in homicide cases. It is for the trial court in each instance to exercise sound discretion in balancing probative value against the risk of unfair prejudice.

¶ 33 In any event, this court will not reverse a conviction if an error is clearly harmless. *See State v. Spreitz,* 190 Ariz. 129, 142, 945 P.2d 1260, 1273 (1997), *cert. denied,* —— U.S. ——, 118 S.Ct. 1315, 140 L.Ed.2d 479 (1998). Error is harmless if we can say beyond a reasonable doubt that it did not affect or contribute to the verdict. *See State v. Bible,* 175 Ariz. 549, 588, 858 P.2d 1152, 1191 (1993). Given the overwhelming physical evidence introduced at trial and the benign nature of the photograph itself, we conclude that this exhibit did not materially affect the outcome of the case.

## Mere Presence Instruction

¶ 34 Defendant appeals the trial court's refusal to give the following "mere presence" instruction:

> Guilt cannot be established by the defendant's mere presence at a crime scene or mere association with another person at a crime scene. The fact that defendant may have been present does not, in and of itself, make the defendant guilty of the crime charged.

Doerr's theory of defense was that both he and Karen Bohl were victims of an attack by a third person. Therefore, he claims, it was appropriate for the jury to consider whether he "was the perpetrator or was merely present."

¶ 35 A trial court should instruct "on any theory reasonably supported by evidence." *State v. LaGrand,* 152 Ariz. 483, 487, 733 P.2d 1066, 1070 (1987); *see also United States v. Jackson,* 726 F.2d 1466, 1468 (9th Cir.1984) (requiring instruction be given "if there is evidence upon which the

jury could rationally sustain the defense"). We will reverse only if the instructions, taken together, would have misled the jurors. *See State v. Schrock,* 149 Ariz. 433, 440, 719 P.2d 1049, 1056 (1986). Where the law is adequately covered by instructions as a whole, no reversible error has occurred. *See State v. Gambrell,* 116 Ariz. 188, 190, 568 P.2d 1086, 1088 (App.1977).

¶ 36 "Mere presence" means more than a lack of criminal intent. It refers to "passivity and nonparticipation" in the crime. *United States v. Perkins,* 926 F.2d 1271, 1283–84 (1st Cir.1991). The trial judge properly rejected the requested instruction because the evidence did not support it. Blood matching the defendant's type and a hair similar to his were found on the victim's body. Moreover, Bohl's blood type was found in the defendant's pubic area. This and other physical evidence plainly indicated that the defendant was more than a passive observer of this crime. At the same time, nothing in the record supports the presence of another person at the scene. In fact, the overwhelming weight of the evidence is to the contrary.

¶ 37 Defendant's reliance on *State v. Noriega,* 187 Ariz. 282, 928 P.2d 706 (App.1996), is misplaced. In that decision, the court expressly limited its analysis to a prosecution for accomplice liability. *Id.* at 285, 928 P.2d at 709. This is not such a case.

¶ 38 Finally, the defense here had ample opportunity to advance its theory that a third person committed the crime, and it did so throughout the trial and at closing. *See State v. Bruggeman,* 161 Ariz. 508, 510, 779 P.2d 823, 825 (1989) ("Closing arguments of counsel may be taken into account when assessing the adequacy of jury instructions."). The trial court did not err in refusing the mere presence instruction.

**Excused Teachers**

¶ 39 On his own motion, the trial judge excused five teachers from the prospective jury panel, explaining that a week-long absence from the classroom would impose a substantial hardship on them and their students. Defendant contends that he was prejudiced by this action because the teachers constituted "the one group which understood and agreed with the presumption of innocence" that had been addressed in the juror questionnaire.

¶ 40 The Sixth Amendment guarantees a fair and impartial jury, but not one having a specific makeup. *See State v. Arnett,* 119 Ariz. 38, 50, 579 P.2d 542, 554 (1978); *see also Taylor v. Louisiana,* 419 U.S. 522, 538, 95 S.Ct. 692, 702, 42 L.Ed.2d 690 (1975) ("Defendants are not entitled to a jury of any particular composition."). Arizona law permits a discharge from jury service for "[a]ny person whose absence from his regular place of employment would, in the judgment of the court, tend materially and adversely to affect the public safety, health, welfare or interest," and anyone who would suffer "undue hardship." A.R.S. § 21–202. We have noted that a trial judge may issue a blanket excuse to teachers and students for hardship reasons. *See State v. Ortiz,* 131 Ariz. 195, 200, 639 P.2d 1020, 1025 (1981), *overruled on other grounds by State v. Gretzler,* 135 Ariz. 42, 659 P.2d 1 (1983); *see also United States v. Ross,* 468 F.2d 1213, 1219 (9th Cir.1972); *Rawlins v. Georgia,* 201 U.S. 638, 640, 26 S.Ct. 560, 561, 50 L.Ed. 899 (1906) (Fourteenth Amendment does not prevent excluding certain classes from jury duty for the good of the community). In this case, the trial judge substantiated a finding of hardship through his questioning of prospective jurors. We see no merit in the defendant's argument. *See Arnett,* 119 Ariz. at 50, 579 P.2d at 554 (excusing jurors falls within "sound discretion" of trial judge).

**Gruesome Photos**

¶ 41 Defendant contests the admissibility of crime scene and autopsy photographs as gruesome and cumulative. We defer to the trial judge absent a clear abuse of discretion. *See Amaya–Ruiz,* 166 Ariz. at 170, 800 P.2d at 1278.

¶ 42 We have already discussed the appropriate analysis to be employed in determining the admissibility of photographs and will not repeat it here. Photos may be placed in evidence for various reasons, such as proving corpus delicti, identifying the vic-

tim, showing the nature and location of injuries, helping to determine the degree and severity of the crime, corroborating witnesses, illustrating or explaining testimony, and supporting a theory of how and why the homicide was committed. *See State v. Castaneda,* 150 Ariz. 382, 391, 724 P.2d 1, 10 (1986). Even when inflammatory, these exhibits may be admitted if the trial judge determines that their probative value outweighs the risk of unfair prejudice. *See Spreitz,* 190 Ariz. at 141, 945 P.2d at 1272.

¶ 43   While the briefs on appeal are unclear in this regard, we conclude that the defendant properly objected to five photographs that are now before us: numbers 46 (Exhibit # 83), 48 (Exhibit # 85), 69 (Exhibit # 81), 81 (Exhibit # 120), and 84 (Exhibit # 121). Photos 46 and 48 depict the extensive blood found at the apartment, including the victim's bloody footprint in the bathroom. Also visible in one of the photos is a knife on the sink, a black broom handle, bloody jeans, and underwear briefs. The prosecution introduced these photographs during the testimony of a police officer who participated in the investigation. They clearly served to corroborate, explain and illustrate testimony concerning the crime scene.

¶ 44   The remaining three exhibits are autopsy photos showing various injuries to the victim. One depicts two lacerations and deep bruising to her right hip. The state offered it during the medical examiner's testimony to show that the injuries were consistent with the knife found at the scene, and with the conclusion that the victim had been struck. Defendant claims that the photograph was cumulative and that the injuries could have been demonstrated in a less gruesome way. We find that it was probative, relevant, and offered for a proper purpose.

¶ 45   Another autopsy photo, taken after blood was cleaned from the victim's face, was used during the medical examiner's testimony to point out "multiple, irregular injuries" to the head and neck. It shows extensive bruising, swelling around the eyes, multiple injuries to the neck and mouth, and a laceration exposing the skull. The final photo depicts the wound left by the amputation of the victim's left nipple and slash marks to the

other nipple. The defense again objected to the gruesomeness of these photographs. However, they were clearly relevant and their probative value outweighed any prejudicial effect.

## Diagram

¶ 46   During trial, the state offered an 8½ by 11-inch diagram of the defendant's apartment with blue and green dots noting the location of certain evidence. Defendant argues that the diagram misled the jury into believing that these dots matched his and the victim's blood, even though the forensic tests used in the investigation identified only PGM subgroups.

¶ 47   Diagrams are widely accepted to illustrate other evidence and to assist the jury in understanding testimony. *See* 3 John Henry Wigmore, *Wigmore on Evidence* § 791 (Chadbourn rev.1970). Their admission falls within the sound discretion of the trial judge. *See Wait v. City of Scottsdale,* 127 Ariz. 107, 109–10, 618 P.2d 601, 603–04 (1980). We have upheld the use of maps and diagrams to illustrate testimony even when they are not absolutely correct, "but [are] sufficiently so to enable the jury or the court to understand better the statements of the witness." *Young Mines Co. v. Blackburn,* 22 Ariz. 199, 207, 196 P. 167, 170 (1921); *see also Rutledge v. State,* 41 Ariz. 48, 53, 15 P.2d 255, 257 (1932).

¶ 48   Detective Olson prepared the exhibit at issue and referred to it during his testimony about the crime scene. Because so much evidence was spread over a large area, with blood of one type sometimes overlapping that of another, it was difficult to describe the various locations where things were found. This diagram was clearly helpful. Furthermore, because the testimony made it clear that the witnesses were discussing PGM group subtypes, we do not believe the jury misunderstood the meaning of the dots. We find no abuse of discretion by the trial judge.

## Flight Instruction

¶ 49   The defense requested the following instruction, which the court denied:

Remaining at a crime scene and calling police does not in itself prove innocence. You may consider any evidence of the defendant's remaining at the crime scene and calling police together with all the other evidence.

Counsel claimed that if Doerr had fled, the state would have requested a "flight or concealment of evidence" instruction, but because he remained at the scene and called the police, the jury should be instructed on "just the opposite." We are unpersuaded by this reasoning. The instructions, as a whole, were sufficient. The court did not abuse its discretion in denying this one.

### SENTENCING ISSUES

¶ 50   Following a presentencing hearing, the trial judge found that this homicide was committed in an especially heinous, cruel, or depraved manner. *See* A.R.S. § 13–703(F)(6). In mitigation, he considered evidence of the defendant's alcohol history, low I.Q., and assertions of brain damage, but concluded that none of these were shown to have significantly impaired his capacity to appreciate the wrongfulness of his conduct or to conform such conduct to the law. *See* A.R.S. § 13–703(G)(1). The court also examined the following nonstatutory factors: the defendant's cooperation with law enforcement, his lack of a criminal history, abusive family history, alcoholism, mental condition, and intelligence level. The judge found that these circumstances were either not proven or insufficient to call for leniency. We are required to conduct an independent review of the aggravating and mitigating circumstances. *See* A.R.S. § 13–703.01.

**Aggravating Circumstances**

¶ 51   The cruelty aggravator focuses on the pain and suffering of the victim prior to death. *See State v. Ramirez*, 178 Ariz. 116, 129, 871 P.2d 237, 250 (1994). "A finding of cruelty requires conclusive evidence that the victim was conscious" during the infliction of violence. *State v. Towery*, 186 Ariz. 168, 188, 920 P.2d 290, 310 (1996), *cert. denied*, 519 U.S. 1128, 117 S.Ct. 985, 136 L.Ed.2d 867 (1997). While the medical examiners could neither pinpoint the sequence

of Karen Bohl's injuries nor determine precisely when she lost consciousness, the physical evidence indicated that she experienced pain and extreme mental anguish. The doctors found bruising and swelling on her hands and arms consistent with defensive actions, and hair was clenched in her fist. Her nasal bones were fractured. She had cuts under her lip. Extensive bleeding from the vaginal and rectal wounds indicated that they occurred prior to or during death. In addition, she had twenty-six other injuries to various parts of her body. These must have been inflicted over a period of time.

¶ 52   Even more persuasive is the crime scene evidence. Bohl's bloody footprint was found on the bathtub, and bloody hair swipes consistent with her PGM subtype were found on walls and other surfaces. Similar findings throughout the apartment suggested a pursuit and struggle. A neighbor testified that she heard "blood-curdling" screams of "No, no!" from a female at about 3:30 that morning, but did not call the police. Bohl's body was found in the hallway, sprawled partially through the opening into a bedroom. Such evidence of a violent, moving confrontation leaves little doubt that the victim feared for her life during the attack. Sufficient proof exists to conclude, beyond a reasonable doubt, that she suffered pain and extreme mental anguish. The trial court properly found cruelty.

¶ 53   Heinousness and depravity focus on the defendant's mental state as demonstrated by his words and actions. *See State v. Salazar*, 173 Ariz. 399, 412, 844 P.2d 566, 579 (1992). The court may take into account a number of elements when deciding whether a murder is heinous or depraved. *See State v. Gretzler*, 135 Ariz. 42, 52–53, 659 P.2d 1, 11–12 (1983). The trial judge in this case considered three such elements: (1) relishing; (2) mutilation; and (3) gratuitous violence. *See id.* at 52, 659 P.2d at 11.

¶ 54   Relishing requires "that the defendant say or do something, other than the commission of the crime itself, to show he savored the murder," thus evidencing debasement or perversion. *State v. Roscoe*, 184 Ariz. 484, 500, 910 P.2d 635, 651

(1996), *cert. denied,* 519 U.S. 854, 117 S.Ct. 150, 136 L.Ed.2d 96 (1996). Victor Rosales, the defendant's cellmate, testified at trial that Doerr described "playing with [Bohl's] blood." This testimony is sufficient to support a finding of relishing.

¶ 55 Mutilation is an act distinct from the killing itself that includes the purposeful severing of body parts. *See State v. Richmond,* 180 Ariz. 573, 580, 886 P.2d 1329, 1336 (1994). Karen Bohl's left nipple was cut off with a sharp-edged instrument, and marks above the right nipple suggested an attempt to amputate it as well. Mutilation is present here.

¶ 56 Gratuitous violence exceeds that which is necessary to kill. *See State v. Hyde,* 186 Ariz. 252, 281, 921 P.2d 655, 684 (1996), *cert. denied,* 519 U.S. 1153, 117 S.Ct. 1091, 137 L.Ed.2d 224 (1997); *State v. Ceja,* 126 Ariz. 35, 40, 612 P.2d 491, 496 (1980). We have found gratuitous violence where the victim suffered a large number of stab wounds and a contact gunshot wound to the head, *Amaya–Ruiz,* 166 Ariz. at 178, 800 P.2d at 1286; a stabbing in the throat following a shooting, *State v. Comer,* 165 Ariz. 413, 429, 799 P.2d 333, 349 (1990); two blows to the head with a bat followed by smothering and strangulation, *State v. Jones,* 185 Ariz. 471, 488–89, 917 P.2d 200, 217–18 (1996); numerous gunshot wounds to the head from different weapons, *State v. Murray,* 184 Ariz. 9, 38, 906 P.2d 542, 571 (1995); continued bludgeoning with a tire jack, *State v. Kiles,* 175 Ariz. 358, 373, 857 P.2d 1212, 1227 (1993); and bruises, scraping or cutting injuries, a wound to the head, deep slashes to the throat, and strangulation, *State v. Walden,* 183 Ariz. 595, 619, 905 P.2d 974, 998 (1995). We have also considered gratuitous violence to be present in circumstances where the murderer might have killed by less violent means. *See State v. Wallace,* 160 Ariz. 424, 427–28, 773 P.2d 983, 986–87 (1989) (finding defendant could have killed with a loaded gun that was nearby, but instead bludgeoned the victim with a pipe wrench).

¶ 57 In this case, medical examiner Dr. Owl–Smith testified that Karen Bohl died of multiple blunt force trauma. Evidence indicated that she was sodomized with both a metal pipe and a broom handle found at the scene. Her rectal and vaginal cavities were ruptured by the force of these objects, causing massive blood loss. Her nose was fractured by blows to the face. The resulting swelling and lacerations so altered facial features that her family could not identify her. One laceration was deep enough to expose her skull. She had knife slashes to her breasts and numerous bruises and injuries to many parts of her body. We uphold the gratuitous violence finding.

¶ 58 Having determined the presence of relishing, mutilation, and gratuitous violence, we agree that this murder was especially heinous or depraved. Because the words "heinous, cruel, or depraved" are set forth by statute in the disjunctive, this aggravating circumstance is established by the existence of any of these elements. *See State v. Laird,* 186 Ariz. 203, 208, 920 P.2d 769, 774 (1996), *cert. denied,* 519 U.S. 1032, 117 S.Ct. 591, 136 L.Ed.2d 520 (1996). Here we have all three. The (F)(6) factor was proven beyond a reasonable doubt.

**Statutory Mitigation**

¶ 59 According to the trial court, the defendant failed to show by a preponderance of the evidence that when he committed the murder his "capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law was significantly impaired, but not so impaired as to constitute a defense to prosecution." A.R.S. § 13–703(G)(1). Defendant contends that efforts to establish this mitigator were irreparably harmed by the court's refusal to permit his examination of professional complaints filed against the state's expert witness, Dr. Youngjohn. The record reflects, however, that after inspecting those complaints *in camera,* the judge allowed defense counsel to question Dr. Youngjohn freely about the number and nature of them. The defense elicited that (1) nine complaints had been filed with the state licensing board against Dr. Youngjohn; (2) the complaints were registered before Dr. Youngjohn's participation in this case; (3) defense experts Dr. Blackwood and Dr. Walter were two of the com-

plainants; (4) a common component of these complaints was Dr. Youngjohn's frequent findings of malingering; (5) no hearings had yet been conducted and the matters were still pending; and (6) investigation could lead to an outright dismissal of the complaints or the loss of Dr. Youngjohn's professional license. Thus, it does not appear that the defendant was deprived in any significant way of an opportunity to attack Dr. Youngjohn's credibility as an expert witness.

¶ 60 Defendant also argues that the court improperly rejected the opinions of defense experts regarding the presence and effect of organic brain damage. He claims that the judge should not have relied on Dr. Youngjohn's testimony because of the witness's questionable competence and the fact that his opinion stood in solitary opposition to the shared opinion of the defendant's three experts.

¶ 61 Defense counsel overstates the testimony of his witnesses. The trial judge found, according to his special verdict, that the opinions of Doctors Blackwood, Walter, and Tatro were "speculative," and our review of the record supports this assessment. Dr. Walter, a clinical neuropsychologist, performed no tests, made no independent evaluation of the defendant, and prepared no report. Instead, he relied on the reports of Tatro, Blackwood, and defense investigator Holly Wake, along with other available documentation. Walter postulated, among other things, that the defendant could have incurred brain damage as a result of injuries suffered in utero. During cross-examination, however, he admitted that there was no factual basis for such a theory. "I am not saying this happened definitely but this, I think, could quite likely have been one of the causes, one of the many factors resulting in his brain damage. I can't say for sure that it occurred." Further questioning about other "factors" raised by Dr. Walter produced similar concessions. Although he testified to his belief that brain damage, if it existed, would likely have affected the defendant's behavior, Dr. Walter admitted that it also might not have had any effect.

¶ 62 Dr. Blackwood conducted psychological tests that indicated to him the presence of brain damage. He was surprised by the results of a PETSCAN, which was negative for such damage, but that did not alter his conclusion. During cross-examination, Blackwood admitted that he found no causal connection between the suspected defect and the murder. He also stated that "[w]ith a longer series of decisions being involved, then the likelihood increases that at some point the person is not acting because of brain damage."

¶ 63 The defense failed to establish that brain damage impaired Doerr's capacity to control his conduct. In fact, extensive evidence was presented to the contrary. His friend, employer, and co-worker each testified that the defendant was a good worker, had a strong mechanical aptitude, and quickly grasped new tasks despite poor reading and writing skills.

¶ 64 The trial judge has broad discretion in determining the weight and credibility given to mental health evidence. *See State v. McKinney*, 185 Ariz. 567, 579, 917 P.2d 1214, 1226 (1996), *cert. denied*, — U.S. ——, 117 S.Ct. 310, 136 L.Ed.2d 226 (1996). We agree with the court's finding that the defendant did not prove that organic brain damage impaired his capacity as required by § 13–703(G)(1).

## Nonstatutory Mitigation

¶ 65 The trial judge found an abusive family history and a dysfunctional childhood as nonstatutory mitigators, but concluded that these circumstances were not substantial enough to outweigh the (F)(6) aggravator. Defendant disputes this conclusion, and contends that the trial judge should have considered additional evidence in mitigation.

¶ 66 Doerr called the police, gave them directions to his apartment, and waited for them to arrive. He answered their questions and allowed them to take physical samples from him. He also pointed out the location of the victim's purse and car. This cooperation, he argues, should carry some mitigating weight.

¶ 67 The trial judge concluded, however, that the defendant was "motivated by self-interest, not any concern for the victim." Thus, his "cooperation" did not constitute a mitigating circumstance. In *State v. Amaya–Ruiz*, this court found no cooperation where the defendant initially denied committing the crime. 166 Ariz. 152, 179, 800 P.2d 1260, 1287 (1990). Here, Doerr could easily have called police out of self-interest or because he was at a loss for alternatives. He denied knowing the victim, how she ended up in his apartment, or any of the events leading to her death. Still, he knew where to find her purse and car. If such cooperation counts at all as a mitigating circumstance, it carries little weight.

¶ 68 The lack of prior felony convictions constitutes a nonstatutory mitigator, but misdemeanors and prior arrests may be considered in assessing this factor. *See State v. Stokley*, 182 Ariz. 505, 523, 898 P.2d 454, 472 (1995). The trial judge gave no mitigating weight to this circumstance because Doerr had one prior felony theft conviction and numerous misdemeanors, including several thefts and DUIs, as well as convictions for criminal damage, assault, and disorderly intoxication. We agree with the trial judge.

¶ 69 Defense counsel claims that, because of an abusive childhood, the defendant left home at a young age and "was still functioning as a child at the time these events occurred." A difficult family background is not mitigating in the absence of "some connection with the defendant's offense-related conduct." *State v. Towery*, 186 Ariz. 168, 189, 920 P.2d 290, 311 (1996), *cert. denied*, 519 U.S. 1128, 117 S.Ct. 985, 136 L.Ed.2d 867 (1997). This burden is heightened for adult offenders because of their increased level of personal responsibility. *See State v. Wallace*, 160 Ariz. 424, 427, 773 P.2d 983, 986 (1989).

¶ 70 No direct evidence was presented at the mitigation hearing to support a causal connection between the defendant's abusive childhood and the murder. Even the psychological witnesses admitted that they could not confirm such a nexus. Three of Doerr's acquaintances, including a long-time friend, his employer, and a co-worker, testified that the defendant was a good worker and maintained social relationships. Moreover, the defendant left home in his early teens and had little, if any, contact with his family for nearly twenty years. While the judge found that the defense had established an abusive family history and dysfunctional childhood by a preponderance of the evidence, he correctly gave these circumstances minimal weight.

¶ 71 The court also accepted the defendant's claim that he was an alcoholic, but found no proof of a causal connection to the crime. Defendant contends that, because of his history and his stated intent to go drinking that night, he was probably intoxicated. He asserts that he was dazed and confused when the investigating officers arrived. The police did not take a blood alcohol test until the afternoon following the murder. Moreover, because the victim had a .25 blood alcohol level, the defendant claims "it is more than probable" that he too was drunk.

¶ 72 Alcohol or drug impairment may constitute a nonstatutory mitigating circumstance when viewed together with a history of abuse. *See Stokley*, 182 Ariz. at 523, 898 P.2d at 472. However, the defendant failed to show that he was intoxicated at the time of the offense. *See State v. Bible*, 175 Ariz. 549, 606, 858 P.2d 1152, 1209 (1993). The investigating officers reported that Doerr was coherent and did not smell of alcohol when they first arrived on the scene. The defense did not produce any witness who had been with Doerr during the evening or who had seen him consume any liquor. Bruce Forsythe, the defendant's employer and friend for many years, testified that whenever Doerr had too much to drink "[h]e usually just sits down in a corner and just passes out," although Doerr's best friend testified that on one occasion he had become violent after drinking. Defendant did not drink on the job and apparently abided by Forsythe's rule against drinking and driving the company truck. Thus, a finding of intoxication could only be based on Doerr's self-reporting, his personal history, Forsythe's testimony that he gave the defendant money

to go drinking, and the victim's blood alcohol level of .25. The trial judge did not err in concluding that the defendant failed to establish this circumstance.

¶ 73 The court also rejected Doerr's I.Q. as a mitigator. It was found to be 80, at the low end of the low average range. Both Doctors Blackwood and Youngjohn testified that this would not affect his ability to know right from wrong. The court found that the defendant had a decent job and worked hard. His employer testified that he had good mechanical aptitude and learned new tasks quickly and easily. The record demonstrates no connection between the defendant's intelligence level and the murder. *See State v. Bishop,* 127 Ariz. 531, 535, 622 P.2d 478, 482 (1980).

¶ 74 Defendant claims that he has "severe organic brain damage," and that this affected his capacity to appreciate the wrongfulness of his conduct or to conform it to the law. Even if the evidence of this defect was insufficient under § 13–703(G)(1), he says, the judge should have given it weight as nonstatutory mitigation.

¶ 75 The defense, however, overstates the case when it asserts that "three experts agreed that the defendant's mental impairment, which included severe organic brain damage and low IQ established a significant impairment of capacity to conform." None of the experts testified to this effect. Dr. Blackwood said that the tests at most "pointed to the presence of brain dysfunction and impaired brain." He admitted that he was surprised by the negative PETSCAN, although it did not cause him to change his conclusions. On cross-examination, Blackwood said he found no causal connection between Doerr's possible brain damage and the homicide. Dr. Walter, who did not conduct tests on the defendant but merely reviewed the other experts' reports, also admitted that he could not connect the brain damage to the murder. "I—well in the sense that I can't say the fact that he had brain damage, probably—I mean, did that cause the murder? No, I cannot say that."

¶ 76 Defendant's third expert, Dr. Tatro, a clinical psychologist, did not testify at trial or during the presentence hearing, but prepared a written report for the public defender a year before trial. He concluded that Doerr "is a seriously disturbed individual as a consequence of organic brain damage." He observed that "[i]n all likelihood, [Doerr] was both seriously out of touch with that part of his personality that normally considers consequences and out of control of his impulses." Tatro, however, did not directly address whether the defendant's brain damage impaired his capacity to know right from wrong on the night of the murder.

¶ 77 The state's expert, Dr. Youngjohn, testified that the medical records showed no evidence of brain damage. He also said that the results of the neuropsychological testing suggested that the defendant was not fully cooperating. Youngjohn observed that Doerr's mechanical aptitude, non-verbal test performance, and grip strength contradicted the alleged damage to his right spheral hemisphere. Under these circumstances, we agree with the trial judge that the defendant failed to establish mental impairment as a nonstatutory mitigator.

**Alleged Constitutional Defects of the Arizona Death Penalty**

¶ 78 Defendant raises numerous constitutional challenges to Arizona's death penalty. We have previously considered and rejected them as follows:

Death penalty constitutes cruel and unusual punishment. *But see State v. Gulbrandson,* 184 Ariz. 46, 72–73, 906 P.2d 579, 605–06 (1995).

Lethal injection constitutes cruel and unusual punishment. *But see State v. Hinchey,* 181 Ariz. 307, 315, 890 P.2d 602, 610 (1995).

Requiring death penalty for one aggravator is unconstitutional. *But see State v. Bolton,* 182 Ariz. 290, 310, 896 P.2d 830, 850 (1995); *Walton v. Arizona,* 497 U.S. 639, 651–52, 110 S.Ct. 3047, 3056, 111 L.Ed.2d 511 (1990).

No right to death-qualify sentencer. *But see State v. Atwood,* 171 Ariz. 576, 645–46 n. 21(3), 832 P.2d 593, 662–63 n. 21(3) (1992).

No statutory standards for weighing. *But see State v. Spears,* 184 Ariz. 277, 291, 908 P.2d 1062, 1076 (1996), *cert. denied,* 519 U.S. 967, 117 S.Ct. 393, 136 L.Ed.2d 308 (1996).

Requiring the defendant to prove mitigating factors is unconstitutional. *But see Gulbrandson,* 184 Ariz. at 72, 906 P.2d at 605.

Death-eligible class not sufficiently narrowed by the "cruel, heinous or depraved" aggravator. *But see id.*

Presumption that death penalty is appropriate is unconstitutional. *But see Spears,* 184 Ariz. at 291, 908 P.2d at 1076.

Consideration of mitigation evidence too restricted. *But see Walton,* 497 U.S. at 651–52, 110 S.Ct. at 3056, 111 L.Ed.2d 511; *State v. White,* 168 Ariz. 500, 514–15, 815 P.2d 869, 883–84 (1991).

Capital statutes discriminate against poor male defendants as applied. *But see State v. Stokley,* 182 Ariz. 505, 516, 898 P.2d 454, 465 (1995); *Jeffers v. Lewis,* 38 F.3d 411, 419 (9th Cir.1994).

Sentencer's discretion insufficiently channeled. *But see State v. Roscoe,* 184 Ariz. 484, 501, 910 P.2d 635, 652 (1996), *cert. denied,* 519 U.S. 854, 117 S.Ct. 150, 136 L.Ed.2d 96 (1996).

Multiple mitigating factors not required to be considered cumulatively. *But see State v. Apelt,* 176 Ariz. 349, 368, 861 P.2d 634, 653 (1993).

Trial court not required to make findings as to mitigating factors. *But see id.* at 358, 861 P.2d at 643.

Prosecutor's discretion to seek death penalty lacks standards. *But see Spears,* 184 Ariz. at 291, 908 P.2d at 1076.

Proportionality review constitutionally required. *But see Pulley v. Harris,* 465 U.S. 37, 50–51, 104 S.Ct. 871, 879, 79 L.Ed.2d 29 (1984); *State v. Salazar,* 173 Ariz. 399, 416–17, 844 P.2d 566, 583–84 (1992).

**Independent Reweighing**

¶ 79   Upon review of the record, we conclude that the trial court properly found the heinous, cruel or depraved aggravator, and

that the mitigating circumstances were insufficient to call for leniency.   Affirmed.

JONES, V.C.J., and FELDMAN, MARTONE and McGREGOR, JJ., concur.