NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
## DIVISION ONE

---

STATE OF ARIZONA, *Appellee*,

*v.*

JONATHAN EUGENE FLOYD, *Appellant*.

No. 1 CA-CR 22-0591
FILED 12-12-2023

---

Appeal from the Superior Court in Yavapai County
No. P1300CR202001399
The Honorable Debra R. Phelan, Judge

**AFFIRMED**

---

COUNSEL

Law Offices of Stephen L. Duncan P.L.C., Scottsdale
By Stephen L. Duncan
*Counsel for Appellant*

Arizona Attorney General's Office, Phoenix
By Casey D. Ball
*Counsel for Appellee*

---

## MEMORANDUM DECISION

Judge Andrew M. Jacobs delivered the decision of the Court, in which Presiding Judge Michael J. Brown and Chief Judge David B. Gass joined.

---

**J A C O B S**, Judge:

**¶1**   Jonathan Floyd appeals his convictions for second-degree murder, aggravated assault, endangerment, and criminal damage arising out of an automobile crash that caused the deaths of two children. Floyd argues the superior court erred by: (1) admitting photographs of the children, and separately, their belongings; (2) allowing a medical examiner to testify about autopsy photographs of the children; and (3) denying his motion for a judgment of acquittal. Because the rulings Floyd challenges were supported by the record and the law, he has not shown the superior court committed reversible error. We affirm.

## FACTS AND PROCEDURAL HISTORY

**A.**  **Floyd Swerved into a Van Containing a Family of Seven While Driving Southbound from Nevada to Arizona.**

**¶2**   On October 3, 2020, at around 5:20 a.m., Floyd was driving south on Highway 93, about thirty miles north of Wickenburg. Floyd's side of the highway had two lanes, while northbound traffic had a single lane. A semi-truck was driving north on the other side of the highway. A family of seven in a van was traveling a safe distance behind the northbound semi-truck driver.

**¶3**   The semi-truck driver noticed Floyd's truck was veering too close to the northbound traffic, grazing the double yellow lines separating north and southbound traffic. As Floyd's truck crossed over the double yellow lines, the semi-truck driver swerved onto the highway shoulder, unsuccessfully seeking to avoid a collision.

**¶4**   Floyd's vehicle collided with the semi-truck's rear tires, projecting his vehicle onto the van. Because the van's driver saw Floyd spinning head-on towards him, he swerved right. Despite swerving, the van's rear end was struck by Floyd's truck. After the van stopped, its driver (the family's father) saw that the mother (in the passenger seat) and three children (in the middle row) were injured but conscious. Father

saw the back of the van was torn open and that C.C. had severe head injuries and J.C. had no pulse. A reconstructionist testified that after hitting the semi-truck first, Floyd's speed was likely thirty to forty-three miles per hour.

¶5        After the crash, a paramedic treated Floyd and asked him questions. The paramedic asked Floyd twice whether he had consumed alcohol and he eventually admitted he had. The paramedic ordered Floyd a helicopter that transferred Floyd to Banner Thunderbird Hospital in Phoenix.

**B.        Floyd had a Blood Alcohol Content Level ("BAC") of at Least 0.066 Combined with Benadryl in His System.**

¶6        At the hospital, Floyd explained that he was on three different blood pressure medications to help with his heart issues. About four to five hours after the crash, a police officer with a valid search warrant took a sample of Floyd's blood. At 9:57 am, Floyd's BAC was 0.066. Floyd tested positive for Benadryl but was not tested for the three blood pressure medications.

¶7        A toxicologist later testified that a retrograde analysis of Floyd's BAC indicated an alcohol level ranging from 0.092 to 0.145 at the time of the crash. The toxicologist explained that alcohol and Benadryl together can increase drowsiness as compared to ingesting either one individually. Floyd's expert later explained Floyd's BAC could have ranged anywhere from 0.066 to 0.204.

**C.        At Trial, the State Introduced Photographs and Testimony Concerning the Deceased Children to Which Floyd Objected Before Moving for Judgment of Acquittal.**

¶8        The state moved to admit photographs of snacks, luggage, pillows, and personal belongings such as a soccer ball, all within Exhibit 18. Floyd objected to Exhibit 18 before and at trial, arguing these photographs lacked relevance and were prejudicial as being overly emotional. The state argued the photographs were relevant in reconstructing the scene and depicted debris at the scene. The superior court overruled Floyd's objections and admitted the photographs.

¶9        Next, the state moved to admit three in-life photographs of the victims, including a photograph of each of C.C. and J.C., and also a family photograph. Before trial, Floyd moved to preclude all three

photographs. The superior court denied the motion on the two individual photographs of the children but precluded the family photograph.

¶10            The state introduced testimony from a medical examiner. At trial, Floyd objected to the medical examiner's conclusion as to the cause of death. Floyd argued that because the term for cause of death is a legal conclusion, if the medical examiner said "homicide," it would go directly to the heart of the case – whether this was second-degree murder or a lesser offense. The state responded that the medical examiner's answer was not a legal conclusion but was instead a medical term. The superior court overruled the objection, finding it relevant and not prejudicial so long as the medical examiner did not conclude it was a "homicide" and used the medical term "accident" instead.

¶11            The medical examiner described C.C.'s autopsy photographs of his bellybutton, legs, dirt covered feet, hands, backside, abrasions covering his lower backside, and hip. The medical examiner also described photographs indicating C.C. was well-nourished and had lost blood circulation. The medical examiner went on to testify that C.C. had massive trauma to his skull, such that his injury was "immediately fatal."

¶12            The medical examiner described autopsy photographs of J.C.'s upper body, lower body, feet, ankles, legs, abrasions and bruises, arms, hands, and mouth. The medical examiner described a diagram he made for J.C., where he marked various fractures on J.C.'s body. Finally, the medical examiner testified that J.C.'s cause of death was skull and spinal injuries.

¶13            The state did not introduce any of C.C.'s autopsy photographs and selectively introduced J.C.'s autopsy photographs. Floyd did not object to the medical examiner's descriptions of the autopsy photographs or the state's introduction of J.C.'s autopsy photographs.

¶14            After the state presented its evidence, Floyd moved for a judgment of acquittal under Arizona Rule of Criminal Procedure ("Rule") 20. Floyd argued the only evidence the state presented was a BAC level range, a possibility that Benadryl influenced Floyd's drowsiness, and a possibility that Floyd ingested blood pressure medications. Floyd argued there was no evidence that amounted to extreme indifference to human life, including that the state did not present evidence that Floyd had been weaving in and out of traffic. The superior court disagreed because "there has been substantial evidence presented by the state to overcome a rule 20 motion, with the exception of only . . . Count 12."

### D. The Jury Convicted Floyd of Second-Degree Murder, Aggravated Assault, Endangerment, and Criminal Damage, and This Appeal Followed.

¶15 The jury deliberated for over seven hours before returning a unanimous verdict, convicting Floyd of second-degree murder, aggravated assault, endangerment, and criminal damage. Floyd timely appealed. We have jurisdiction under Article VI, Section 9 of the Arizona Constitution and A.R.S. §§ 12-120.21(A)(1), 13-4031, and 13-4033(A).

## DISCUSSION

¶16 Floyd argues the superior court erred by: (1) admitting in-life photographs of the children; (2) admitting photographs of the children's belongings; (3) allowing the medical examiner's testimony describing the autopsy photographs; and (4) denying Floyd's Rule 20 motion for judgment of acquittal.

### I. The Superior Court Did Not Err By Admitting Photographs of the Children While Living or of Their Belongings.

#### A. The Superior Court Did Not Abuse its Discretion by Admitting the In-Life Photographs of the Children.

¶17 We review the court's admission of in-life photographs of victims for an abuse of discretion. *State v. Cota*, 229 Ariz. 136, 147 ¶ 45 (2012); *see State v. Doerr*, 193 Ariz. 56, 64 ¶¶ 29, 32 (1998) (explaining "[i]t is for the trial court in each instance to exercise sound discretion" to review in-life photographs). First, the photographs must be relevant to be admitted. *Doerr*, 193 Ariz. at 64 ¶ 29. A photograph is relevant if it helps the jury resolve an issue of fact. *Id.* Second, the court must determine if the photograph is likely to "inflame or incite passion in the jurors." *Id.* If the answer to that question is yes, the court must weigh the "photograph's probative value against its prejudicial effect." *Id.* Where a photograph's probative value is not substantially outweighed by its prejudicial effect, it is admitted. *See id.* Third, even if the court abuses its discretion by admitting a photograph that is substantially more prejudicial than probative, we will not reverse if the error is harmless. *Id.* at 64 ¶ 33.

¶18 We first consider whether the photographs were relevant. *Doerr*, 193 Ariz. at 64 ¶ 29. Floyd argues the photographs were not relevant because the children's identities were known. That view sweeps too broadly. Photographs may be admissible to prove a crime, identify a victim, demonstrate a crime's nature and location, or corroborate the

state's theory of a crime. *State v. Castaneda*, 150 Ariz. 382, 391 (1986). Here, the photographs were relevant because they "personalize the victim[s] and help to complete the story for the jurors." *Doerr*, 193 Ariz. at 64 ¶ 32.

¶19 As to prejudice, we are cautious in ratifying the admission of in-life photographs to complete the story of a criminal case because they can "generate sympathy for the victim" and have a prejudicial effect. *Doerr*, 193 Ariz. at 64 ¶ 32. But again, Floyd's argument against these photographs extends too far. They are benign in comparison to the autopsy photographs, and it would unreasonably hamstring the state to forbid any depiction of the crash's aftermath (because it would show children's possessions) or any depiction of the crash's victims. *State v. Ellison*, 213 Ariz. 116, 141 ¶ 115 (2006) (holding that superior court did not abuse its discretion when allowing admission of in-life photographs because they were "benign" when compared to post-mortem photographs). Moreover, the court balanced considerations of relevance and prejudice by barring admission of a family photograph, thus showing the victims but not further emphasizing the crash's effect on survivors and the family unit. Because the photographs were used to complete the prosecution's story to the jury and would have minimal prejudicial effect, the court did not abuse its discretion when it admitted them.

### B. The Superior Court Did Not Abuse Its Discretion in Admitting Photographs of the Children's Belongings.

¶20 We analyze the superior court's admission of the photographs of belongings using a three-part analysis like that in *Doerr*. *State v. Murray*, 184 Ariz. 9, 28 (1995) (explaining the need to analyze photographs for relevance and potential to arouse prejudice, then weighing the probative value against the prejudicial effect).

¶21 First, we determine if the photographs of the children's luggage, snacks, soccer balls, and pillows were relevant. *Doerr*, 193 Ariz. at 64 ¶ 29. The prosecution used these photographs to reconstruct the scene and help the jury understand the crash that lay at the core of this trial, making them relevant as they corroborated the state's reconstruction of the crash. *See id.* In particular, the state's reconstructionist testified that these photos were within the debris field, which showed tire marks, engine fluid, transmissions, skidding, and helped explain the type of stop the van made.

¶22        As to prejudice, we take Floyd's point that photographs of a crime scene have a lesser probative value when the defendant does not contest the fact at issue.  *See State v. Davolt*, 207 Ariz. 191, 209 ¶ 63 (2004) (holding court abused its discretion by admitting crime scene photographs of victims' charred bodies because the defendant did not contest fact at issue and photographs were both cumulative and likely to inflame jury). It is also true Floyd was not contesting the scene reconstruction.

¶23        Even so, the photographs of objects here were not particularly inflammatory.  Moreover, the state had a legitimate interest in showing the jury the debris field in the reconstructed scene.  Accordingly, the photographs' probative value was not substantially outweighed by any unfair prejudice to which Floyd points.  We thus conclude the court did not abuse its discretion by admitting the photographs.[1]

**II.    The Superior Court Did Not Err by Admitting the Medical Examiner's Testimony Describing the Autopsy Photographs.**

**A.    We Review the Superior Court's Decision to Admit the Medical Examiner's Testimony for Fundamental Error.**

¶24        Floyd argues we should review the superior court's decision to admit the medical examiner's testimony for abuse of discretion, the standard that applies to properly raised objections to the admission of evidence at trial.  *See State v. Chappell*, 225 Ariz. 229, 238 ¶ 28 (2010).  The state counters that we should review this issue for fundamental error because Floyd raised it for the first time on appeal.  *See State v. Escalante*, 245 Ariz. 135, 138 ¶ 1 (2018).  The state is correct.  Though Floyd objected to other portions of the medical examiner's testimony, he never objected

---

[1]        Even if Floyd was correct that the court abused its discretion by admitting the in-life photographs and photographs of the crash debris, their admission would be harmless error.  Error is harmless if the state shows, "beyond a reasonable doubt[] that the error did not contribute to or affect the jury's verdict."  *Id.* at 209 ¶ 64; *State v. Arias*, 248 Ariz. 546, 555 ¶ 31 (App. 2020) (noting the state's burden under harmless error review).  Because the state presented ample evidence justifying the jury's verdict - that Floyd was driving with Benadryl and alcohol in his system and that he knowingly drove while impaired - the crash scene photographs did not contribute to the verdict.

to the medical examiner's testimony describing the autopsy photographs. Floyd has the burden of showing fundamental, prejudicial error. *Id.*

### B. Admitting the Medical Examiner's Testimony Concerning the Autopsy Photographs Was Not Error, Much Less Fundamental Error.

**¶25** To assess fundamental error, we must first determine if there was error. *Id.* Cause of death is always relevant. *State v. Rushing*, 243 Ariz. 212, 219 ¶ 27 (2017); *State v. Spreitz*, 190 Ariz. 129, 141–42 (1997). Testimony describing cause of death is also relevant even if the defendant does not dispute the injury. *See Rushing*, 243 Ariz. at 219 ¶ 27 (holding that doctor could testify about autopsy photographs regarding injuries even though defendant did not dispute the nature of those injuries).

**¶26** At trial, the state introduced testimony from the medical examiner. The medical examiner testified as to the children's causes of death and explained the distinct medical categories for causes of death, noting they were not legal conclusions. Then, the medical examiner described the autopsy photographs of the children's body parts and abrasions. Finally, the medical examiner concluded that C.C.'s injury was "immediately fatal," and J.C.'s cause of death was due to skull and spinal injuries.

**¶27** The medical examiner's testimony was relevant because it was related to the children's causes of death. *Rushing*, 243 Ariz. at 219 ¶ 27 (finding that cause of death is always relevant). Floyd has not shown the court erred by allowing the examiner's testimony because the medical examiner testified as to the cause of death and merely described the autopsy photographs. *Id.*

### III. The Superior Court Did Not Err by Denying the Rule 20 Motion for Judgment of Acquittal.

**¶28** The superior court should grant the motion for judgment of acquittal if there is "no substantial evidence to support a conviction." Ariz. R. Crim. P. 20(a)(1). Sufficiency of evidence is a question of law, which we review *de novo*. *State v. West*, 226 Ariz. 559, 562 ¶ 15 (2011). We consider whether any trier of fact, after viewing the evidence in the light most favorable to the state, could find the essential elements beyond a reasonable doubt. *Id.* at 562 ¶ 16.

**¶29** Here, Floyd argues there was insufficient evidence to show extreme indifference to human life − an essential element for second-

degree murder. Floyd explains that the only evidence the state presented concerned his potential blood alcohol content, Benadryl may have affected how drowsy Floyd was, and that his blood pressure medications could have been in his system. Floyd argues there was no evidence that amounted to extreme indifference to human life, including evidence like the truck weaving in and out of traffic as opposed to only evidence that the truck swerved. The court disagreed and responded that "there has been substantial evidence presented by the state to overcome a [R]ule 20 motion, with the exception of only . . . Count 12."

¶30        Reviewing this record *de novo*, the state presented substantial evidence showing extreme indifference to human life. To find whether a defendant exhibited extreme indifference to human life, we look at all the surrounding evidence. *Id.* Here, the state's toxicologist explained that Floyd's BAC was 0.066 about four to five hours after the crash, and according to a retrograde analysis, it would have been in the range of 0.092-0.145 at the time of the crash. Floyd's own expert retrograde analysis further confirmed the state's toxicologist, explaining Floyd's BAC could have ranged from 0.066 to 0.204 at the time of the crash. Finally, Floyd was positive for Benadryl and the state's toxicologist explained the combination of alcohol, Benadryl, and prescription medication was likely to make Floyd drowsier when operating his truck. All of this evidence supported Floyd behaving with extreme indifference to human life.

¶31        The state also presented testimony from a collision reconstructionist. The reconstructionist testified Floyd's truck crossed the double yellow lines, sideswiped a semi-truck, began spinning, and then hit the van. The state also presented testimony that Floyd's truck was moving at thirty to forty-three miles per hour when it struck the van and was not moving faster because it struck the semi-truck first. Additionally, the state presented evidence that Floyd's truck was "grazing" the double yellow lines separating traffic, and that Floyd swerved into northbound traffic. This evidence is sufficient to support denying a judgment of acquittal. *See generally State v. Woodall*, 155 Ariz. 1, 5 (App. 1987) (finding that the state presented ample evidence by showing the defendant had a prior DUI, had been warned of the repercussions from drinking and driving, had turned down a ride before leaving the bar, drove over the speed limit, had a similar driving history, and had a BAC three times the threshold).

## CONCLUSION

¶32      For these reasons, we affirm.



AMY M. WOOD • Clerk of the Court
FILED:   AA