IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

STATE OF ARIZONA, *Appellee,*

*v.*

JODI ANN ARIAS, *Appellant.*

No. 1 CA-CR 15-0302
FILED 4-21-2020

Appeal from the Superior Court in Maricopa County
No.  CR 2008-031021-001
The Honorable Sherry K. Stephens, Judge

**AFFIRMED**

COUNSEL

Arizona Attorney General's Office, Phoenix
By Terry M. Crist III
*Counsel for Appellee*

Maricopa County Public Defender's Office, Phoenix
By Margaret M. Green, Cory Engle
*Counsel for Appellant*

---

## OPINION

Presiding Judge Jennifer B. Campbell delivered the opinion of the Court, in which Judge Michael J. Brown joined. Judge Kenton D. Jones specially concurred.

---

**C A M P B E L L**, Judge:

**¶1**      Jodi Arias appeals her conviction and sentence for premeditated first-degree murder.[1] She asserts that trial publicity and prosecutorial misconduct deprived her of a fair trial. For the following reasons, we affirm.

## BACKGROUND

**¶2**      After meeting at a business convention in September 2006, Arias and the victim began a turbulent sexual relationship that persisted until she killed him in June 2008. Nine days before his death, the victim communicated with Arias via text messages, repeatedly referring to her in a sexually derogatory manner and characterizing her as "evil," "worthless," and a "sociopath."

**¶3**      Two days after those text messages, Arias' grandparents, with whom she lived in California, notified local police that their home had been burglarized. Although money and other valuables in plain view were not taken, Arias' grandparents reported that a small .25 caliber handgun had been stolen.

**¶4**      On June 3, 2008, Arias drove to a former boyfriend's home and borrowed two gas cans, explaining she was setting out for a road trip through the desert. Before leaving California, Arias purchased another gas can, rented a car, made numerous fuel purchases, and turned off her cell phone.

**¶5**      Five days later, friends of the victim discovered his decomposing body in the shower of his Mesa home. He had been stabbed numerous times, his throat had been slit, and he had been shot in the head.

---

[1]      In a separate memorandum decision, *State v. Arias*, 1 CA-CR 15-0302, filed simultaneously with this opinion, we reject Arias' remaining arguments. *See* Ariz. R. Sup. Ct. 111(h); Ariz. R. Crim. P. 31.19.

While officers were at the scene, Arias called the police and asked to speak with the lead detective. Although he declined to take her call at that time, the detective spoke with Arias the following day when she called the police again. At that time, Arias described her relationship with the victim and, when asked, denied that the victim owned a gun. Initially, Arias denied being in Arizona when the victim was killed. Upon further questioning, however, she admitted being in the victim's home at the time of his death, claiming two armed intruders murdered him, causing her to flee for her life.

¶6        Meanwhile, investigators found substantial forensic evidence at the crime scene. In the victim's master suite, investigators recovered a .25 caliber bullet casing, a strand of Arias' hair, and a "latent palm impression" matching Arias' hand. They also found a digital camera and memory card in the victim's washing machine. Photos on the memory card documented sexual activity between Arias and the victim the day he was killed. The photos also depicted the victim in the shower immediately before his death as well as a few unfocused photographs inadvertently captured during the killing. Based upon this evidence, the State charged Arias with first-degree premeditated murder and, in the alternative, first-degree felony murder. Several months later, the State filed a notice of intent to seek the death penalty.

¶7        At trial, the medical examiner testified that the victim suffered three fatal injuries—a chest wound, caused by a knife, piercing his heart; a neck wound, caused by a knife, perforating the jugular vein and carotid artery; and a gunshot head wound penetrating his frontal lobe. The victim also suffered numerous non-fatal stab wounds and multiple defensive wounds, which showed he had attempted to disarm his attacker before his throat was slit and he was shot in the head. Because the nature of some of the wounds reflected that the victim was in motion when he was stabbed, and there was considerable bleeding at each of the stab wound sites, the medical examiner concluded that the victim was alive when each stab wound was inflicted. Nine stab wounds were consistent with the victim having had his back turned toward his attacker when they were inflicted, including a wound to the back of his head that was so deep it left a divot missing from his skull and chipped away bone fragments. Given the severity of the neck wound, the medical examiner testified that the victim lost consciousness within seconds of having his throat slit, immediately rendering him incapable of further defending himself. Because there was no blood loss at the entry site of the gunshot wound or hemorrhaging in the brain, the medical examiner further opined that the victim may have already died by the time he was shot in the head.

¶8          Testifying on her own behalf and contrary to her police interview statements, Arias ultimately admitted killing the victim. She claimed she did so in self-defense after the victim threatened her life and "lunged" at her in "anger." To support her claim that her actions were reasonable and justified, Arias testified that the victim had previously physically attacked her on multiple occasions, and she was afraid of him.

¶9          Undermining this defense, the State presented evidence that Arias had planned the killing (staging the burglary of her grandparents' home to conceal her theft of the gun, renting a vehicle, acquiring gas cans to avoid leaving a trail of fuel purchases, turning off her cell phone) and attempted to clean the crime scene and cover up her wrongdoing (leaving the victim a voicemail several hours after the killing, sending the victim an email three days after the killing, providing a false alibi, and lying to the police).

¶10         After a 67-day trial, the jury unanimously found Arias guilty of premeditated first-degree murder. The jury also found she committed the murder in an especially cruel manner but was unable to reach a unanimous verdict on the sentence—death or life in prison. After a second penalty-phase trial, a different jury was likewise unable to reach a unanimous verdict, and the superior court sentenced Arias to prison for her natural life.

## DISCUSSION

### I.    Trial Publicity

¶11         Although Arias denies that publicity *before* trial caused her prejudice, she contends the superior court improperly permitted media access to the courtroom *during* trial, including a livestream broadcast of the proceedings. She asserts this media coverage deprived her of a fair trial and an impartial jury.

¶12         Before trial, and against the advice of counsel, Arias participated in multiple nationally televised interviews. During a pretrial hearing, defense counsel referenced these interviews and expressed frustration that Arias actively sought media attention, complaining that she seemed primarily "focused on the PR aspects of [the] case" and preferred "trying her case in the press."

¶13         Approximately 18 months before trial, a local television news outlet requested permission to provide photographic coverage of the courtroom proceedings. In granting the request, the superior court ordered

media personnel to comply with Arizona Supreme Court Rule ("Rule") 122 and forbid: (1) "use of flashbulbs, strobe lights or other artificial lights" in the courthouse, (2) "use of cameras in the hallway, stairwell, elevator, cafeteria, or other public or private area[s] of the courthouse," and (3) any photographs of the victim's family. Arguing the media coverage would interfere with her constitutional right to a fair trial, Arias moved for reconsideration. On the heels of her motion to reconsider, *In Session* (formerly known as *Court TV*) requested permission to film the proceedings, contending its coverage would not infringe Arias' constitutional rights or compromise the dignity of the court proceedings. In response, Arias moved to sequester the prospective jury.

¶14        After multiple hearings on the various motions, the superior court granted *In Session*'s request to film the proceedings, finding Arias had failed "to show that the likelihood of harm [] outweigh[ed] the benefits to the public of camera coverage." *See* Ariz. R. Sup. Ct. 122(d) (stating requests for electronic coverage of courtroom proceedings should be approved absent "specific, on-the-record findings that there is a likelihood of harm . . . [that] outweighs the benefit of coverage to the public"). The court again ordered that all coverage comply with Rule 122 and outlined certain protocols regarding the number of cameras, disabling of defense microphones, recording of witnesses, and so forth. *See* Ariz. R. Sup. Ct. 122(e) (stating that the superior court "will preserve the dignity of the proceeding by designating the placement of equipment and personnel" and forbidding any "conduct or dress that may disrupt or detract from the dignity of the proceeding"). The court also denied Arias' motion to sequester the jury.

¶15        During jury selection, the superior court informed the prospective jurors that: (1) the trial would be televised, (2) no juror would be shown on camera, and (3) empaneled jurors would be required to "avoid all media coverage" of the case and "report [] immediately" if they saw or heard "anything about the case" outside the courtroom. Notwithstanding this instruction and the court's prior rulings establishing the parameters of media coverage, issues regarding publicity arose frequently throughout the trial. For example, (1) on at least two occasions, media members inadvertently filmed and broadcast some jurors' images; (2) a member of the media attempted to contact a juror as the juror left the courthouse; (3) on at least one occasion, the media broadcast Arias' leg restraint; (4) members of the media obtained and broadcast Arias' journals and her parents' police interview statements; (5) Juror No. 5 was excused from service, spoke with the media, and then returned to the courtroom to watch the trial as a spectator; (6) after Juror No. 8 was arrested and excused from

service midway through the trial, police disclosed his identifying information to the media; and (7) a media cameraman attempted to film the jurors as they walked to their parking lot. Beyond those violations of the court's orders, other events made clear that the trial was attracting huge amounts of public interest as it progressed. The defense team received numerous death threats and other harassment; a courtroom spectator stated, "Jodi, I wish you were dead"; spectators followed the defense team in public, posting associated pictures and commentary on social media; and groups gathered outside the courthouse and heckled the defense team as they entered the building.

¶16        "Any criminal case that generates a great deal of publicity presents some risks that the publicity may compromise the right of the defendant to a fair trial." *Chandler v. Florida*, 449 U.S. 560, 574 (1981). For this reason, "[t]rial courts must be especially vigilant to guard against any impairment of the defendant's right to a verdict based solely upon the evidence and the relevant law." *Id.*

¶17        Although any trial publicity may risk juror prejudice, "[a]n absolute constitutional ban on broadcast coverage of trials cannot be justified." *Id.* at 574–75. Instead, "the appropriate safeguard against such prejudice is the defendant's right to demonstrate that the media's coverage of [the] case—be it printed or broadcast—compromised the ability of the particular jury that heard the case to adjudicate fairly," or "that broadcast coverage of [the] particular case had an adverse impact on the trial participants sufficient to constitute a denial of due process." *Id.* at 575, 581.

¶18        Contrary to Arias' argument, issues regarding publicity are not reviewed for structural error, and the defendant bears the burden to show prejudice. That being said, when a defendant demonstrates that trial publicity "was so extensive or outrageous that it permeated the proceedings or created a 'carnival-like atmosphere,'" we "presume prejudice without a particularized examination of the publicity's effect on the jury." *State v. Atwood*, 171 Ariz. 576, 631 (1992) (quoting *State v. LaGrand*, 153 Ariz. 21, 34 (1987), *disapproved on other grounds by State v. Nordstrom*, 200 Ariz. 229, 241, ¶ 25 (2001)). Under this standard, the defendant has "'the very heavy' burden" of demonstrating the publicity was so prejudicial that, as a matter of law, the jurors could not decide the case fairly. *State v. Payne*, 233 Ariz. 484, 499–500, ¶¶ 28, 30 (2013) (quoting *State v. Cruz*, 218 Ariz. 149, 157, ¶¶ 17, 20 (2008)).

¶19        To evaluate whether the publicity in this case created a "carnival-like atmosphere," we first consider three United States Supreme

Court cases in which prejudice was presumed. In *Rideau v. Louisiana*, 373 U.S. 723, 724 (1963), the defendant "confessed" under police interrogation to the charges for which he was convicted. After the police department disclosed a 20-minute video of the interrogation, a local television station broadcast the defendant's confession three times before the trial started. *Id.* at 724–25. Without examining the record for evidence of actual prejudice, the Supreme Court reversed the conviction, concluding the trial was a "hollow formality," and the real trial had occurred when a substantial portion of the community's population saw the defendant admit guilt on television. *Id.* at 725.

¶20 Similarly, in *Estes v. Texas*, 381 U.S. 532 (1965), the Supreme Court presumed prejudice after concluding that the trial had been conducted without the "dignity essential to the 'integrity of the trial' process," due primarily to the intrusions of the press—reporters had been permitted to sit within the bar of the court, the courtroom had been overrun with television equipment, and broadcasters had frequently interrupted the trial proceedings. *Id.* at 536, 561 (quoting *Craig v. Harney*, 331 U.S. 367, 377 (1947)).

¶21 Like *Estes*, in *Sheppard v. Maxwell*, 384 U.S. 333, 343–44 (1966), the trial proceedings were upended to accommodate the media—reporters clustered within the bar of the small courtroom, making it nearly impossible for the defendant and counsel to communicate confidentially, and members of the press moved in and out of the courtroom so frequently that it was difficult for jurors to hear what witnesses and counsel were saying. Given the overwhelming and disruptive media presence in the courtroom, as well as the trial court's failure to adequately admonish the jurors not to read or listen to any coverage of the case, the Supreme Court found the publicity inherently prejudicial. *Id.* at 353–63.

¶22 In this case, it is uncontroverted that the trial publicity was extensive, but nothing in the record reflects anything comparable to the "mockery of justice" that occurred in *Rideau*, *Estes*, and *Sheppard*. *See Atwood*, 171 Ariz. at 631. While members of the press were seated in the courtroom, they were confined to the gallery, and their use of cameras and other equipment was restricted. To ensure that the media's presence was not disruptive, the superior court frequently questioned the jurors about the media and immediately addressed the only concern jurors raised—the minimally distracting sound of still photography—by precluding any still photography during the presentation of evidence. From the outset of trial, the court imposed strict protocols on the media's courtroom conduct to

prevent their presence from distracting the jurors or otherwise disrupting the trial proceedings.

**¶23**     Given this record, we conclude the media's presence in the courtroom during trial, restricted by compliance with Rule 122, neither detracted from the solemnity of the proceedings nor created a setting wholly inappropriate for the administration of justice. Therefore, we do not presume prejudice from the trial publicity.

**¶24**     This does not, however, end the inquiry. Absent presumed prejudice, a defendant may show actual prejudice by establishing that the empaneled jurors were influenced by the publicity surrounding the case. *Atwood*, 171 Ariz. at 631; *Payne*, 233 Ariz. at 500, ¶¶ 31–32.

**¶25**     Arias has not cited, and our review of the record has not revealed, any evidence to suggest that the empaneled jurors were actually prejudiced by the media coverage. During voir dire, the superior court specifically asked whether prospective jurors had any concerns about publicity. After the jury was sworn, the court repeatedly admonished the jurors to avoid media coverage and regularly questioned them regarding any exposure to media about the trial, which each juror uniformly denied. *See Payne*, 233 Ariz. at 500, ¶¶ 32–33 (explaining the court repeatedly "admonished the jury to avoid coverage and report any exposure," and the defendant failed to show the jurors failed to comply with that admonition); *State v. Cruz*, 218 Ariz. 149, 158, ¶¶ 25–26 (2008) (same); *Atwood*, 171 Ariz. at 632–33 (same); *State v. Greenawalt*, 128 Ariz. 150, 162–63 (1981) (holding a defendant fails to demonstrate prejudice from publicity absent a showing jurors disobeyed the trial court's admonition not to view any media coverage).

**¶26**     Although Arias cites several allegedly prejudicial events as evidence of actual prejudice, the superior court swiftly addressed those matters: (1) when informed that some jurors' images had been inadvertently broadcast, the court questioned the jurors individually and all denied any concerns about the media and declared that they could impartially decide the case; (2) in response to media attempts to contact the jurors outside the courtroom, the court offered the jurors security escorts, but each declined; nonetheless, the court incrementally increased the level of security assigned to the jurors throughout the trial; (3) when informed that the media had broadcast Arias' leg restraint, the court admonished the media to film Arias only above the waist; (4) after a spectator's outburst, court security immediately escorted the spectator from the courtroom; (5) in response to defense counsel's reports of harassment and threats, the

court provided the defense team with a security detail and secured parking; (6) after the prosecutor's office released materials to the media, the court ordered the prosecutor's office to refuse any further public records requests about the case until the conclusion of trial; (7) when Juror No. 5 returned to court to watch the trial after she had been excused from service and interviewed by the media, the court had her escorted from the courtroom; (8) after Juror No. 8 was excused from service and contacted by the media, the court rebuked the police department for disclosing his identity; and (9) after Arias participated in a media interview shortly after the jury rendered its guilt-phase verdict, the court ordered no further media interviews until after the penalty phase. Given the superior court's immediate and direct responses to these events and the jurors' uniform avowals that the media's presence and coverage did not hinder their impartiality or compromise their ability to fairly decide the case, Arias has failed to demonstrate actual prejudice or bias of any juror. *See Payne*, 233 Ariz. at 500, ¶ 33.

¶27    Arias also asserts that court-ordered security measures prejudiced the jury by conveying to the jurors that their safety was in jeopardy. But, in an appropriate case, providing security escorts for jurors is "precisely the type of prophylactic measure[] courts should take" to prevent the presence of the media from "tainting the jury." *Id*. at 500, ¶ 34.

¶28    Finally, Arias argues the superior court failed to protect the defense team from negative media exposure that arguably led to harassment and threats. While it is undisputed that defense counsel and defense experts received numerous threats and were vilified in various corners of social media, it is unclear what Arias would have had the court do to protect the defense team from negative media exposure. Furthermore, consistent with the court's repeated and specific findings, the record reflects that defense counsel and the defense experts were composed and comported themselves professionally in the courtroom, notwithstanding the intense public scrutiny. Accordingly, Arias has failed to show that either the jurors' ability to impartially and fairly decide the case or her defense team's trial performance was adversely affected by the publicity.[2]

## II.    Prosecutorial Misconduct

¶29    Arias alleges a long list of instances of prosecutorial misconduct, arguing that the misconduct by the prosecutor denied her both

---

[2]    Arias also contends that the prosecutor engaged in public misconduct. We address this publicity-based misconduct claim with Arias' other claims of prosecutorial misconduct.

due process and a fair trial. Given the sheer breadth and number of the allegations raised, we will specifically address only the most substantial claims of purported misconduct but will consider all the alleged instances in evaluating their cumulative effect.

**¶30** "To prevail on a claim of prosecutorial misconduct, a defendant must demonstrate that the prosecutor's misconduct so infected the trial with unfairness as to make the resulting conviction a denial of due process." *State v. Morris*, 215 Ariz. 324, 335, ¶ 46 (2007) (internal quotation omitted). In other words, the "misconduct must be so pronounced and persistent that it permeates the entire atmosphere of the trial." *Id.* (internal quotation omitted). Prosecutorial misconduct constitutes reversible error only if "a reasonable likelihood exists that the misconduct could have affected the jury's verdict, thereby denying [the] defendant a fair trial." *Id.* (internal quotation omitted).

**¶31** The standard of review applicable to each claim depends upon whether Arias objected to the alleged misconduct in the superior court. If she objected, we review for harmless error, but if she failed to object, we review only for fundamental error. *State v. Henderson*, 210 Ariz. 561, 567, ¶¶ 18–19 (2005). "Error is harmless only if we can say, beyond a reasonable doubt, that it did not contribute to or affect the verdict." *State v. Green*, 200 Ariz. 496, 501, ¶ 21 (2001) (internal quotation omitted). Under harmless error review, the State bears the burden of proof. *Henderson*, 210 Ariz. at 567, ¶ 18. Fundamental error, on the other hand, is error going to the foundation of the case, error that takes from the defendant a right essential to his or her defense, or error of such magnitude that the defendant could not possibly have received a fair trial. *State v. Escalante*, 245 Ariz. 135, 142, ¶ 21 (2018). "If the defendant establishes fundamental error under prongs one or two, he must make a separate showing of prejudice, which also 'involves a fact-intensive inquiry.'" *Id.* (quoting *Henderson*, 210 Ariz. at 568, ¶ 26). "If the defendant establishes the third prong, he has shown both fundamental error and prejudice, and a new trial must be granted." *Id.* "The defendant bears the burden of persuasion at each step." *Id.*

**¶32** Even when individual acts of prosecutorial misconduct are harmless, their cumulative effect may demonstrate "that the prosecutor intentionally engaged in improper conduct and did so with indifference, if not a specific intent, to prejudice the defendant." *State v. Roque*, 213 Ariz. 193, 228, ¶ 155 (2006) (internal quotation omitted), *overruled on other grounds by State v. Escalante-Orozco*, 241 Ariz. 254, 267, ¶¶ 11–15 (2017). Therefore, we not only review the separate incidents for error, but evaluate their cumulative effect on the trial. *Id.*

¶33        We must evaluate Arias' claims of prosecutorial misconduct in the context of the issues presented to the jury at trial. As previously discussed, *supra* ¶ 8, Arias admitted at trial that she, alone, killed the victim. She denied murdering the victim, however, testifying that she retrieved the victim's gun from his closet after he threatened her life, and only shot him in self-defense when he lunged at her. She acknowledged that she also repeatedly stabbed the victim, as evidenced by more than two dozen knife wounds, but testified that she had no memory of any physical attack after the gunshot. To explain this memory gap, Arias claimed that at the time, she feared for her life and so did not mentally process what occurred. In support of this defense, Dr. Richard Samuels testified that Arias (1) suffers from post-traumatic stress disorder, and (2) experienced dissociative amnesia during and immediately following the killing. Likewise, defense expert witness Alyce LaViolette, a psychotherapist and expert in issues related to domestic violence, testified that the victim repeatedly physically abused Arias during the course of their relationship. She testified that, viewing the killing within the context of that "domestic violence," Arias believed she needed to "defend [her] life" when the victim threatened her. Finally, Dr. Robert Geffner opined that the gunshot wound to the victim's frontal lobe was not immediately incapacitating, contrary to the medical examiner's testimony that the nature of the gunshot would have caused the victim to immediately collapse, had he been standing. Because Arias' state of mind at the time of the killing was the *only* question before the jury, her credibility and the reliability of these witnesses were critical to the defense.

## A.  Misconduct During Questioning of Witnesses

¶34        Arias contends the prosecutor engaged in misconduct during his cross-examination of numerous witnesses.

¶35        As "a representative of a government whose obligation to govern fairly is as important as its obligation to govern at all," a prosecutor may not "engage in abusive, argumentative, and harassing conduct." *Pool v. Superior Court*, 139 Ariz. 98, 103 (1984). This principle, "that officers of the law are bound by and must act within the law," is of preeminent importance, "even though the necessity of so doing may put [prosecutors] at a disadvantage in dealing with criminals or those accused of crime." *Id*. Because a "prosecutor's interest in a criminal prosecution is not [to] win a case, but [to ensure] that justice [is] done," he must "refrain from improper methods calculated to produce a wrongful conviction just as [he shall] use all proper methods to bring about a just conviction." *Id*. (internal quotation omitted); *see also State v. Minnitt*, 203 Ariz. 431, 440, ¶ 41 (2002) ("[A] prosecutor has an obligation not only to prosecute with diligence, but to

seek justice" and "must refrain from all use of improper methods designed solely to obtain a conviction"); *State v. Hughes*, 193 Ariz. 72, 80, ¶ 33 (1998) ("The prosecutor has an obligation to seek justice, not merely a conviction, and must refrain from using improper methods to obtain a conviction."). These precepts forbid a prosecutor from making unsupported insinuations or "imply[ing] unethical conduct on the part of an expert witness without having evidence to support the accusation." *Hughes*, 193 Ariz. at 86, ¶ 59; *see also In re Zawada*, 208 Ariz. 232, 237, ¶ 14 (2004) ("[A] prosecutor cannot attack [an] expert with non-evidence, using irrelevant, insulting cross-examination and baseless argument designed to mislead the jury.").

¶36        Contrary to these legal principles, and in violation of his ethical duties, the prosecutor in this case regularly used aggressive questioning techniques and innuendo to intimidate and malign defense witnesses.

## 1. Cross-Examination of Arias

¶37        Arias testified for 18 days at trial and was subjected to cross-examination on seven of those days. From the outset, the prosecutor's questioning of Arias was extremely combative and badgering. On multiple occasions, Arias answered the substance of the prosecutor's questions without parroting the precise language he used, and the prosecutor aggressively responded with some variation of "Did I ask you that?" For example, the prosecutor asked Arias whether she had ever told the victim that her sister was "dumb." When Arias answered, "Yes. I called her dumb and stupid," the prosecutor responded, without objection, "Did I ask you whether or not you called her stupid, ma'am?" After Arias agreed that the prosecutor had not asked her that question, he continued, "I asked you whether or not you called her dumb, right?" This method of questioning was improperly demeaning and argumentative.

¶38        On another occasion, the prosecutor confronted Arias with the false statements she first made to police officers. Although Arias readily admitted that she had lied to the investigating detective, the prosecutor asked, "Just because you're in this court doesn't mean you have to tell the truth, that's what you're telling us, right?" The superior court sustained defense counsel's objection, but that did not prevent the prosecutor from continuing his combative questions. Over objection, he repeatedly asked Arias whether she had "a problem" with "telling the truth," and in response to her repeated admissions that she had lied to the police, the prosecutor asked, "So whenever it doesn't suit you, it's a lie, right?" During the second day of cross-examination, defense counsel moved for a mistrial based upon

the prosecutor's argumentative questioning. The court denied the motion but admonished the prosecutor to phrase his questions in a "non-argumentative fashion" going forward. Although the court sustained numerous objections to this form of argumentative questioning, the prosecutor persisted.

¶39 Apart from the argumentative phrasing of questions, the prosecutor's aggressive tone and combative, bullying demeanor were also recurring issues. Arias repeatedly complained that the prosecutor was screaming at her, protesting that his tone and demeanor were so intimidating that she was unable to think clearly and was having difficulty listening to and answering his questions. Indeed, when the prosecutor asked whether she had a comprehension problem, Arias testified that she only had trouble answering the prosecutor's questions because he exuded considerable anger toward her. Citing the prosecutor's conduct and behavior, defense counsel moved for a mistrial six times during Arias' testimony, arguing the prosecutor was engaging in theatrics rather than questioning, and specifically noting that the prosecutor whispered at Arias and purposefully approached her to mock her. The superior court denied the motions but instructed counsel to "move on," be "professional," and "avoid argumentative questions."

### 2. Cross-Examination of Dr. Samuels

¶40 Early in his cross-examination, Dr. Samuels acknowledged that, shortly after he evaluated Arias, he gave her a self-help book on combating low self-esteem. Seizing on that admission, the prosecutor questioned the expert at length about why he gave Arias the book. Dr. Samuels testified that he did not consider the book a gift or a matter of any significance, explaining he had done the same for numerous other people during his professional life. Rejecting this explanation, the prosecutor repeatedly asked Dr. Samuels whether he gave Arias the book because he had "started to like her." In response, Dr. Samuels repeatedly denied developing any feelings for Arias, stating he gave her the book because she was suicidal.

¶41 At that point, defense counsel moved for a mistrial, contending the prosecutor had engaged in misconduct by yelling at Dr. Samuels and slapping his hands in a loud, dramatic fashion. When invited by the court to respond to the accusation, the prosecutor stated that the behavior was simply his "style," which he asserted "bothered" no one but defense counsel. The court denied the motion for mistrial but instructed

the prosecutor to "take it down just a tad," adding that "a calmer tone could be appropriate."

¶42          Shortly thereafter, the prosecutor asked Dr. Samuels whether he had "memory problems" because he denied having previously testified that Arias presented "an imminent [suicide] threat." Dr. Samuels acknowledged testifying that Arias presented as suicidal during her evaluation but denied having ever testified that she was imminently suicidal. As a follow-up, the prosecutor again asked Dr. Samuels about his asserted "relationship" with Arias that involved giving her "gift[s]," and the expert uniformly denied the characterization.

¶43          The following day, defense counsel again moved for a mistrial predicated on prosecutorial misconduct, arguing the prosecutor had repeatedly insinuated that Dr. Samuels and Arias had an inappropriate relationship without any foundation for the assertion. The superior court denied the motion, concluding the prosecutor had latitude to explore any possible bias. It is improper cross-examination, however, to insinuate an inappropriate relationship between a doctor and patient when no evidence supports the allegation. *In re Zawada*, 208 Ariz. at 237, ¶ 14. Although the prosecutor had latitude to explore any bias that he had a reasonable basis to believe existed, once Dr. Samuels explained it was his common practice to give self-help books, the prosecutor had no basis to continue with that line of questioning. The court erred by allowing the prosecutor to circle back and reinforce the improper and unsupported insinuation.

¶44          When cross-examination resumed, the prosecutor inquired about a diagnostic test Dr. Samuels had administered in evaluating Arias. Specifically, the prosecutor asked whether, by its own terms, the test was not "to be used in a court case." After Dr. Samuels disagreed, the prosecutor again asserted that the test instrument itself stated it should not be used in court, and Dr. Samuels asked, "And what are you reading from, sir?" The prosecutor responded, without objection, "[S]ir, I ask the questions. Do you understand that?" While the prosecutor's job is to uncover the truth and seek justice, this entire exchange was both argumentative and devoid of any probative purpose. If the prosecutor had material that called the witness' use of the test into question, he should have disclosed that information so the witness could respond sensibly. The only inference to be drawn from the record is that the prosecutor had no such intent and his only purpose was to belittle the witness.

¶45          Once he finished asking Dr. Samuels about diagnostic tests, the prosecutor turned to Arias' journals. Initially, he asked about the

absence of any negative statements about the victim in the journals, but then quickly transitioned to whether the journals provided any evidence that Arias is assertive. Confused by the question, Dr. Samuels asked the prosecutor to clarify whether he was suggesting that negative statements about the victim would demonstrate that Arias is assertive. In response, the prosecutor stated, "Do you have a problem with remembering?" At that point, defense counsel objected, and the superior court sustained the objection. There was no legitimate purpose for the prosecutor's question.

¶46        When the prosecutor later returned to the diagnostic evaluations, he confronted Dr. Samuels with a mistake in his report, and Dr. Samuels admitted that he had made a "typographical" error. Following that admission, the prosecutor inquired about Dr. Samuels' hourly fee and then asked, without objection, whether Dr. Samuels was not provided enough money to "pay[] attention" and avoid such mistakes. Again, this question was not aimed at eliciting relevant information but to improperly belittle the witness. Likewise, throughout Dr. Samuels' cross-examination, the prosecutor asked variations of "Did I ask you that?" when Dr. Samuels attempted to provide complete answers to the questions posed. As made clear by the record, these follow-up questions were not asked to elicit any relevant testimony and served no legitimate purpose.

¶47        As reflected in the jurors' questions for Dr. Samuels, the prosecutor's insinuation that the expert witness had an inappropriate relationship with Arias found some purchase. One juror asked Dr. Samuels whether he "always develop[ed] such a fond relationship" with his evaluation subjects. In response, Dr. Samuels again denied any improper relationship, stating he was an "impartial evaluator" and avowing he had conducted his evaluation ethically. Again, there is no support for the inference that Dr. Samuels was unprofessional in his evaluation of Arias, and the prosecutor's repeated insinuations otherwise violated both the rules of evidence and the rules of professional conduct. *See Hughes*, 193 Ariz. at 86, ¶ 59; *In re Zawada*, 208 Ariz. at 237, ¶ 14.

¶48        When the prosecutor later asked whether Arias' pretrial media interviews belied any claim of post-traumatic stress disorder, Dr. Samuels stated, "I don't see it that way," and the prosecutor replied, "You wouldn't see it that way because you have feelings for the defendant, right?" After defense counsel objected, the attorneys approached the bench and defense counsel moved for a mistrial, arguing, "This prosecutor is certainly out of control and the Court has continued to acquiesce to this behavior." The superior court rejected defense counsel's argument and denied the motion, reaffirming its previous ruling that the prosecutor was

"entitled to question the bias of any witness." Before concluding his cross-examination, the prosecutor raised the improper insinuation yet again, asking Dr. Samuels whether he had altered his evaluation results because of his feelings for Arias. The expert adamantly denied having done so. Although a prosecutor may inquire about possible bias *if* there is a reasonable basis to believe such a bias exists, he may not make unsupported insinuations. Nothing in the record supports the prosecutor's repeated assertions that Dr. Samuels engaged in improper or unethical conduct.

¶49        Finally, as the prosecutor reached the end of his questioning, defense counsel objected once again, asking the superior court to instruct the prosecutor to refrain from "yell[ing] at the witness." When the prosecutor denied yelling, the court stated, "it's close but not quite there" and instructed the prosecutor to "[t]ake a deep breath." This is an example of the exchanges that permeated the trial. On this record, it is clear that the prosecutor maintained an impermissibly aggressive and combative demeanor with defense witnesses, and the court's repeated admonitions were insufficient to curtail his unprofessional conduct. As the gatekeeper, the court is charged with maintaining proper decorum in the courtroom and ensuring that counsel abides by appropriate standards of professionalism, including compliance with the rules of professional conduct. The court has tools to encourage compliance with its orders including sanctions, contempt and the ultimate judicial response—declaring a mistrial.

### 3.  Cross-Examination of LaViolette

¶50        As with Arias, the prosecutor's cross-examination of LaViolette was combative from the start. After inquiring generally about her training and experience, the prosecutor asked a few pointed questions regarding her psychological tests, which prompted LaViolette to respond, "Are you angry at me?"— eliciting laughter throughout the courtroom. Once the superior court admonished the spectators and quieted the room, the prosecutor asked whether his anger would cause LaViolette to alter her testimony. She responded, "No, certainly not." When the prosecutor followed up by again asking what effect his "perceive[d]" anger could have, LaViolette stated that the prosecutor's demeanor hindered her ability to answer questions. Moments later, the following exchange occurred:

> [The Prosecutor:] Yes or no?  Did you use this [metric] to tell us that the defendant was in an abusive relationship, yes or no?

[Defense Counsel:] Objection, Judge. She tried to answer the question. He interrupted her.

[The Court:] Overruled. You may answer.

[The Prosecutor:] Yes or no?

[LaViolette:] It's not a yes or no. Do you want the truth, Mr. Martinez, or do you want yes or no?

[The Prosecutor:] Ma'am, I'm asking you questions. You seem to be having trouble answering my questions.

[LaViolette:] I have trouble with --

[The Prosecutor:] If you have a problem understanding the question, ask me that. If you want to -- *do you want to spar with me*? Will that affect the way you view the testimony?

[Defense Counsel:] Objection, Judge. Argumentative.

[The Court:] Sustained.

(Emphasis added.)

¶51        At that point, defense counsel asked to approach the bench and moved for a mistrial predicated on prosecutorial misconduct, stating, "He has now yelled at this witness, badgered this witness, offered to spar with this witness. This conduct is, apart from being completely unprofessional, is damaging to Ms. Arias' right to a fair trial." In response, the prosecutor countered, "There has been no yelling going on with regard to this particular witness. This witness does not want to answer any questions, and the record is clear as to what her issues are." Defense counsel refuted the prosecutor's account, stating, "This idea that there was no yelling is absolutely preposterous. He was yelling at the witness repeatedly. I know the record cannot--the court reporter's record cannot reflect it, but it was obviously happening. He was screaming at her. That tends to be his style, to scream at witnesses who don't tell him what he wants to hear." After hearing from counsel, the superior court denied the motion for mistrial but admonished the prosecutor to "scale it back a bit," noting he had been "a little overzealous."

¶52        Moments later, the prosecutor asked LaViolette whether she agreed that Arias had never written anything negative *about the victim* in her journals. When LaViolette disagreed, the prosecutor pressed her to

identify any "negative things the defendant wrote *about herself*." LaViolette challenged the premise of the question, stating that the prosecutor had asked her whether Arias had written anything negative *about the victim* in her journals. In response, the prosecutor asked LaViolette whether she had "a problem understanding the question."

¶53        During a subsequent ex parte hearing to discuss how the stress of the trial was exacerbating her ongoing health problems, LaViolette told the superior court that she had never seen a prosecutor permitted to "bully" witnesses the way the court had permitted the prosecutor to bully witnesses in this case. The court responded merely by saying, "[E]verybody has their style."

¶54        Before the prosecutor completed his cross-examination of LaViolette, defense counsel again objected to the prosecutor's "tone" and stated for the record that the prosecutor had been "yelling at the witness." Although the prosecutor denied the accusation, the superior court acknowledged that the prosecutor had "raise[d]" his voice and instructed him to "[t]ake a deep breath." While instructing an agitated lawyer to take a deep breath may be appropriate in some instances, the court's admonition here was obviously insufficient. The court has a duty to ensure that evidence is presented ethically. In other words, it is the court's job to police improper conduct, and a persistent badgering and combative demeanor is not simply a prosecutorial "style." It is prosecutorial misconduct.

### 4.   Cross-Examination of Dr. Geffner

¶55        To rebut the medical examiner's testimony that the victim would have been immediately rendered incapacitated had he been alive at the time he was shot, Dr. Geffner testified that he had personally treated two patients who sustained gunshot wounds to the frontal lobe that did not result in incapacitation. Indeed, Dr. Geffner testified that numerous cases of frontal lobe injuries without attendant incapacitation have been documented in medical literature.

¶56        During his brief cross-examination, the prosecutor confronted Dr. Geffner with his testimony in a Tennessee case and asked, without objection, whether the trial court in that case had found he was "a hired gun." Upon having his recollection refreshed with the court's ruling, Dr. Geffner acknowledged that the court had characterized him as a "hired gun" and also found his testimony to be "completely without merit." Moving on, the prosecutor confronted Dr. Geffner with his testimony in a Hawaii case, asking whether the trial court in that case had found that his

affidavit lacked credibility. Although Dr. Geffner conceded that the court had made that finding, the prosecutor pressed the issue and asked whether the court had "found that [Dr. Geffner] ma[de] things up," which Dr. Geffner adamantly denied. While the preceding cross-examination questions are proper impeachment, the prosecutor went further when moments later, he asked Dr. Geffner whether he believes in "mak[ing] things up." Objecting that the question was argumentative, defense counsel moved to strike, which the court sustained and granted. Likewise, when the prosecutor asked Dr. Geffner about lying and began to inquire whether he had attended the "Alyce LaViolette school of --," the court granted defense counsel's motion to strike. The prosecutor's job is to uncover the truth, not to use bullying tactics and innuendo to sully a witness' credibility and distract from the relevant testimony.

> It's the easiest thing in the world for people trained in the adversarial ethic to think a prosecutor's job is simply to win. It is not. An attorney for the government is a representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done.

*United States v. Blueford*, 312 F.3d 962, 968 (9th Cir. 2002) (internal quotations omitted). It is plain to us that the prosecutor in this case lost sight of his ethical duties.

### 5. Overall Questioning

¶57        Many of the prosecutor's cross-examination questions "were so improper that we are compelled to conclude" that he "either knew or should have known of the impropriety." *Pool*, 139 Ariz. at 107. In other words, there "is no possible basis upon which" many of the prosecutor's questions "could be justified." *Id*. at 104, n.7. Not only were the prosecutor's questions frequently argumentative and disrespectful, some questions, particularly those posed to Dr. Samuels, contained "innuendo designed to prejudice the witness" without any supporting evidence. *Id*.

¶58        Moreover, aside from the argumentative phrasing of questions, the record reflects that the prosecutor consistently displayed a hostile demeanor toward the defense witnesses. Although the superior court repeatedly admonished him to "take a deep breath," lower his voice, and "scale it back," the prosecutor persisted and maintained a belligerent

and harassing manner throughout the trial. While a cross-examiner should be afforded great latitude, *State v. Rothe,* 74 Ariz. 382, 384 (1952), the superior court is tasked with ensuring that cross-examination is "kept within 'reasonable' bounds," *State v. Fleming,* 117 Ariz. 122, 125 (1977). After it became apparent that the prosecutor was not deterred by the court's repeated admonitions and sustained objections, the court should have taken stronger measures to bring the situation under control, including warning the prosecutor that if his improper behavior continued he would be in contempt of the court's order, and then holding the prosecutor in contempt if he did not comply.

## B.  Misconduct Related to Publicity

**¶59**　　　　Arias also argues the prosecutor engaged in misconduct by seeking publicity during trial.

**¶60**　　　　Mid-trial, out of the presence of the jury, defense counsel informed the superior court that the prosecutor had been observed engaging in misconduct "outside the courtroom." Specifically, the prosecutor had been seen on the courthouse steps posing for pictures with spectators, signing autographs, and appearing with at least one media personality. Without denying the allegations, the prosecutor responded that "[w]hat happens outside the courtroom is not misconduct."　The prosecutor went on to claim that even if a juror saw him posing for pictures with spectators or signing autographs, it would not constitute prosecutorial misconduct because it occurred outside the courtroom.

**¶61**　　　　At an evidentiary hearing on the issue, a cable television news producer testified regarding a media "package" that had been produced "about the prosecutor being treated like a celebrity." In addition, the producer testified that she had personally witnessed the prosecutor posing for photographs outside the courtroom with spectators and signing autographs. She further stated, however, that she had seen no jurors in the vicinity at the time. Based upon the evidence presented, the superior court implicitly found that the prosecutor had engaged in publicity-related misconduct, but nonetheless concluded there was no "reasonable likelihood that the misconduct could affect the jury's verdict" because no juror was present at the time.

**¶62**　　　　A prosecutor's ethical obligations do not stop at the threshold of the courtroom. To the contrary, a prosecutor's conduct outside the courtroom is constrained by his charge to protect the integrity of the trial and preserve the fairness of the proceedings. For example, Ethical Rules

3.6(a) and 3.8(f) curtail a prosecutor's public speech about a case, prohibiting him from making any extrajudicial statement that has a "substantial likelihood of materially prejudicing" the matter before the court. Ariz. R. Sup. Ct. 42, ER 3.6(a), 3.8(f).

**¶63**        On this record, it is clear that the prosecutor improperly engaged in self-promoting conduct. His efforts to gain personal notoriety were beneath the office he held as a representative of the State of Arizona in the matter. *Cf. State v. Bracy*, 145 Ariz. 520, 526 (1985) (finding the prosecutor had engaged in misconduct both by submitting to an interview and by "pos[ing] for photos to accompany the article"). As a minister of justice, the prosecutor represented the government, not himself or his personal interests. This prosecutor lost sight of his role.

### C. Misconduct in Closing Argument

#### 1. Use of Certain Evidence

**¶64**        Arias asserts the prosecutor improperly used evidence that was admitted only for other limited purposes. First, she contends the prosecutor impermissibly argued that she stole her grandfather's gun, even though he told the superior court that he did not seek to introduce the underlying testimony regarding the reported burglary for its truth. As addressed in our separately filed memorandum decision, Arias' pretrial and trial admissions regarding the gun theft nullified any potential prejudice from the erroneous admission of the underlying hearsay testimony.

**¶65**        Second, Arias argues that the prosecutor improperly relied upon defense expert Dr. Janeen DeMarte's testimony to argue premeditation despite representing to the superior court that the expert's testimony pertained only to memory, not to Arias' state of mind before the killing. As explained in the separately filed memorandum decision, the prosecutor was permitted to argue that Arias' higher-order behaviors immediately after the killing contradicted the defense theory that she was in a near-unconscious state immediately before and during the killing and therefore lacked the requisite mens rea.

**¶66**        Third, Arias contends the prosecutor improperly used certain evidence for propensity purposes—to demonstrate that she has violent tendencies and acted in conformity therewith when she killed the victim. During closing argument, the prosecutor stated that Arias had stolen the victim's ring, even though the superior court had previously sustained an objection to Dr. DeMarte's testimony to that effect and permitted her to

testify only that Arias had taken the piece of jewelry. Although the prosecutor's characterization of the taking as a theft was contrary to the court's ruling and therefore improper, the record does not reflect that he used that evidence for propensity purposes. Rather, the prosecutor cited this evidence to show that Arias had engaged in a pattern of violating the victim's privacy and accessing his property without permission. As Arias correctly notes, the prosecutor also referenced email admissions that she had made to the victim regarding her prior aggressive behaviors, but the prosecutor's statement regarding the admissions was fleeting. Moreover, viewed in context, the prosecutor referenced the emails to undermine Arias' credibility, not to argue that she has a propensity for violence. In any event, the court instructed the jurors to consider any other-acts evidence only to "establish the defendant's motive, intent, preparation or plan," not to "determine the defendant's character or character trait or to determine that the defendant acted in conformity with the defendant's character or character traits and therefore committed the charged offense." We presume jurors follow their instructions, and Arias has offered no evidence to rebut that presumption. *See State v. Goudeau*, 239 Ariz. 421, 469, ¶ 214 (2016).

### 2. Characterizations of Defense Witnesses

**¶67**        During closing argument, the prosecutor repeatedly told the jurors, without objection, that Arias was a liar and a manipulator, primarily tethering those characterizations to evidence that contradicted her pretrial statements and trial testimony. Because attorneys are given wide latitude in closing arguments and may draw reasonable inferences from the evidence, *State v. Miniefield*, 110 Ariz. 599, 602 (1974), those unfavorable characterizations, alone, were not improper.[3]

**¶68**        In more than a dozen other instances, however, the prosecutor also argued that Arias had directly wronged the *jurors*, asserting she had "looked at each and every one of [them]" and "lied to [them]" and "attempted to manipulate [them]." Further personalizing these purported deceptions, the prosecutor implored the jurors not to let Arias "scam" them,

---

[3]        Likewise, to the extent Arias challenges the prosecutor's argument that she had previously engaged in violence and stalking and had sought pretrial media attention, those statements were tied to trial evidence. Moreover, contrary to Arias' assertions, the record reflects that the prosecutor's references to her as "evil," a "sociopath," and so on were quotations from the victim's text messages rather than the prosecutor independently casting aspersions.

implicitly arguing that they needed to return a guilty verdict to prove that they did not "buy her lies" and could not "be manipulated." This argument improperly placed the jurors' discernment and intelligence at issue. To the point, the prosecutor impermissibly suggested that the jurors would be deluded unless they rendered a guilty verdict. *See Pool,* 139 Ariz. at 102–03 (concluding characterizations of the defendant as a "cool talker" and a defense witness as a "good buddy" of defense counsel were "grossly improper and designed to raise prejudice in the jurors"). This argument was intended to improperly prejudice the jurors.

¶69 Without objection, the prosecutor also portrayed defense expert witness LaViolette as a liar. To support that contention, the prosecutor cited LaViolette's inability to name a single male client, despite having testified that she had appeared in court on behalf of at least one or two men (and her ultimate admission that she had only written reports for those clients), and her curriculum vitae representation that she had been a keynote speaker at a seminar, when she was actually only a "breakout" (subgroup) keynote presenter. Based on those purported misrepresentations, the prosecutor argued that LaViolette's testimony was "contaminated" and "foul." The prosecutor certainly could point to the two arguable inaccuracies and suggest that the jurors should carefully assess LaViolette's expert opinion accordingly. However, his wholesale denigration of her testimony as abhorrent was, without question, improper. *See State v. Comer*, 165 Ariz. 413, 426–27 (1990) (concluding the prosecutor's descriptions of the defendant as a "monster" and "filth" "exceeded the bounds of appropriate closing argument" and constituted misconduct); *see also State v. Lamar*, 205 Ariz. 431, 441, ¶ 54 (2003) (explaining a prosecutor should refrain from expressing any personal belief about the credibility of a witness).[4]

---

[4] Citing the prosecutor's argument that Dr. Samuels had "trouble" scoring Arias' tests and inexplicably had rescored her tests, Arias argues the prosecutor impermissibly posed an "innuendo laden question" by inviting the jurors to determine what "the motivation was for the rescoring." Although on its face this portion of the prosecutor's argument does not appear improper, as explained previously, it hearkened back to the prosecutor's improper questions insinuating that Dr. Samuels and Arias had an inappropriate and unethical relationship.

### 3. Appeals to Jurors' Passions and Fears

¶70      Arias contends the prosecutor engaged in misconduct by insinuating that the jurors would be complicit in the victim's killing if they failed to convict her. Without objection, the prosecutor argued that Arias had asked the jurors "to carry those gas cans for her" and "help her fill them." Continuing with this metaphor, the prosecutor urged the jurors to fulfill their "duty" and return "a verdict of guilt" so they could leave "the stench of gasoline" behind them rather than contaminating their "hands." This appeal to the jurors' passions and fears unquestionably exceeded permissible bounds. *See Morris*, 215 Ariz. at 337, ¶ 58 (stating a prosecutor is not permitted to make arguments that "appeal to the fears or passions of the jury"); *State v. Herrera*, 174 Ariz. 387, 396 (1993) (explaining the latitude afforded counsel is not unlimited and a prosecutor may not use "his remarks to inflame the minds of jurors with passion or prejudice").

## D. Cumulative Misconduct Error Analysis

¶71      Prosecutorial misconduct undeniably permeated this case. Rather than a few isolated missteps, a pattern of intentional misconduct saturated the trial.

¶72      Although not specifically argued by Arias, the record reflects that the prosecutor's belligerent conduct began even before opening statements. During voir dire, the prosecutor questioned Juror No. 61 at length about the death penalty. Depending on the nature of the case, proper voir dire may subject prospective jurors to minor discomfort. A prosecutor, however, may not belittle or antagonize a juror during the voir dire process. Here, the prosecutor's questioning caused the juror to contact the superior court later and ask to be excused because she felt "badgered by the prosecutor."[5] The prosecutor's hostile and aggressive demeanor continued with each witness whose testimony was inconsistent with the State's theory of the case. Notwithstanding repeated admonitions from the court to temper his tone and refrain from asking argumentative questions, the prosecutor persisted in the same manner throughout the trial.[6] Even more

---

[5]      The superior court excused Juror No. 61.

[6]      On a few occasions, the prosecutor also directed extremely inappropriate remarks toward defense counsel, but these comments were made outside the presence of the jury. *See State v. Speer*, 221 Ariz. 449, 458, ¶ 44 (2009) (concluding the prosecutor's "entirely unprofessional" statements, uttered "outside the presence of the jury," did not deprive the

egregious, the prosecutor: (1) argued that the defense experts were unethical liars, (2) suggested that Arias had personally wronged the jurors and they needed to prove they were not deceived by returning a guilty verdict, and (3) insinuated that the jurors would be deemed complicit if they failed to convict.

¶73        Nonetheless, we conclude that Arias is not entitled to a new trial because there is no reasonable likelihood that the misconduct affected the jury's verdict. That is, the overwhelming evidence of Arias' guilt, as reflected through her own admissions and as clearly set forth within the record, would not have permitted any reasonable juror to acquit her of the charged offense. *See Escalante*, 245 Ariz. at 144, ¶¶ 29–31; *see also State v. Trostle*, 191 Ariz. 4, 16 (1997) (concluding that the prosecutor's statement was an impermissible comment on defendant's failure to testify, but the error did not contribute to the jury's verdict in light of the "overwhelming evidence of guilt and the context within which it was made"); *cf. State v. Rhodes*, 110 Ariz. 237, 238 (1973) (concluding prosecutorial misconduct is prejudicial when "evidence hangs in delicate balance [and] any prejudicial comment [is] likely to tip the scales in favor of the State").

¶74        Because Arias admitted killing the victim, the State needed only to show that she acted with premeditation rather than in self-defense. To prove her state of mind, the prosecutor presented substantial uncontroverted evidence that Arias planned the killing before she left California: (1) a .25 caliber handgun, the same type of weapon that Arias used to kill the victim, was taken from Arias' grandparents' home less than a week before the killing; (2) Arias rented a vehicle for her trip to Arizona, even though she owned a car; (3) Arias borrowed two gas containers, purchased a third, and made numerous fuel purchases before she left California; and (4) Arias turned off her cell phone before she crossed into Arizona. Contrary to Arias' testimony that she shot the victim when he lunged at her, and somehow unknowingly stabbed him repeatedly thereafter, the medical examiner testified that the victim was likely already dead when he was shot in the head, as evidenced by the trajectory of the bullet, which would have rendered him immediately incapacitated, and the absence of any blood at the entry site, demonstrating that no blood was circulating to the victim's head by that time. Moreover, the .25 caliber bullet casing was found in a pool of the victim's blood on the bathroom floor, but

defendant of a fair trial). For example, during a bench conference, the prosecutor stated he would "[expletive] want to kill [him]self" if he were married to defense counsel.

no blood was on the top portion of the casing, meaning the victim had sustained a substantial injury before he was shot.

¶75      Even if a reasonable juror believed both Dr. Geffner's testimony that the gunshot wound to the head was not immediately incapacitating and Arias' testimony that she first shot the victim in self-defense and he continued to pursue her thereafter, other medical and forensic evidence overwhelmingly proves beyond a reasonable doubt that Arias murdered the victim with premeditation and without justification. First, by any account and regardless of whether she shot the victim first or last, Arias switched weapons during the killing—using both a gun and a knife. This reflects an intent to kill and undermines any claim that she unintentionally shot the victim when he threatened her. Second, Arias stabbed the victim nine times in the back, including a blow so powerful that she shattered part of his skull. Third, the blood spray and spatter demonstrated that the victim, while bleeding heavily, leaned against the bathroom counter, facing the mirror and away from his attacker. Fourth, the undisputed evidence reflects that the victim attempted to walk down the hall, away from the bathroom and Arias, but eventually collapsed from the injuries she had already inflicted. At that point, while the victim lay in his own pooling blood, Arias pursued him and slit his throat, severing his windpipe. Given this uncontroverted evidence, even if the victim initially threatened Arias and she reasonably feared for her life and shot him to protect herself, there can be no question that she had sufficient time to reflect about what she was doing, pursued the victim during his attempted escape, and delivered yet another lethal blow to his defenseless body.

¶76      In sum, we conclude that Arias was convicted based upon the overwhelming evidence of her guilt, not as a result of prosecutorial misconduct. *See State v. Newell*, 212 Ariz. 389, 403, ¶ 70 (2006) ("When considered in the context of the entire trial, we agree that the overwhelming evidence of guilt influenced the jury to convict," rather than the verdict resulting from the prosecutor's misconduct). Stated differently, for the many instances of prosecutorial misconduct to which Arias objected at trial, the State has met its burden of showing that "the guilty verdict actually rendered in this trial was surely unattributable to the error." *See State v. Anthony*, 218 Ariz. 439, 446, ¶ 39 (2008) (internal quotations omitted). Conversely, for the relatively few instances of misconduct to which Arias did not object, she has not met her burden of showing that "without the error, a reasonable jury could have plausibly and intelligently returned a different verdict." *See Escalante*, 245 Ariz. at 144, ¶ 31. Thus, we also conclude that Arias was not deprived of a fair trial. *See State v. Cornell*, 179 Ariz. 314, 328, 330 (1994) ("[A]lthough the conduct was undeniably

improper, we look first to determine whether counsel's actions were reasonably likely to have affected the jury's verdict, thereby denying the defendant a fair trial. . . . This was not a close case in which the improper questions might have tipped the scales and deprived [the defendant] of a fair trial.").

¶77 Moreover, while we conclude that this is an egregious case of misconduct by a highly-experienced prosecutor, and we strongly disapprove of his actions, we are compelled to follow the well-established principle that we do not "reverse convictions merely to punish a prosecutor's misdeeds [] or to deter future misconduct." *See*, *e.g.*, *State v. Hulsey*, 243 Ariz. 367, 394, ¶ 123 (2018) (internal quotation omitted). Like any attorney who engages in misconduct, however, a prosecutor may not escape personal accountability. *See Cornell*, 179 Ariz. at 331 ("We strongly disapprove of such conduct by an experienced prosecutor, and we remind the bar that this kind of misconduct can result not only in reversal . . . but can also have serious personal consequences."). As such, we find it necessary to refer the matter of his misconduct to the State Bar of Arizona. *See id*. at 331, n.10 ("We note again that we do not punish the public because of the misdeeds of its lawyer. However, we also do not allow seriously improper conduct to go unreported.").

## CONCLUSION

¶78 For these reasons, we affirm.

**JONES**, J., specially concurring:

¶79 Without hesitation, I join the majority in its analysis and conclusions, including our determination that the State presented overwhelming evidence of the premeditated and perverse murder of one human being by another. To be sure, Arias' conviction stands today not *because* of the State's devotion, above all else, to the pursuit of justice, but *in spite of* the prosecutor's willingness to put self-interest, self-promotion, and self-aggrandizement above his duty to maintain the integrity of our judicial system.

¶80        The physical evidence presented at trial showed the victim was stabbed twenty-seven times, had his throat cut so deeply he was nearly decapitated, and, after having succumbed to those injuries, was shot in the head.  Arias' attempts to manufacture an alibi at the time of the victim's death were confused and immediately unraveled; she then admitted having inflicted the entirety of the injuries unassisted.  The jury ultimately rejected Arias' justification defense and was within its right to convict.  Nonetheless, I write separately to further elaborate upon a matter that cannot, in my mind, be left underemphasized or simply passed over: that is the persistent, pervasive, inappropriate and unprofessional conduct of the State's attorney, Juan Martinez.

¶81        Attorneys licensed in the state of Arizona are bound by the Arizona Rules of Professional Conduct, which impose, first and foremost, a "special responsibility for the quality of justice."  Ariz. R. Sup. Ct. 42, pmbl. 1.  Lawyers are expected to "demonstrate respect for the legal system and for those who serve it" and work to "further the public's understanding of and confidence in the rule of law and the justice system."  Ariz. R. Sup. Ct. 42, pmbl. 5, 6.  The State's attorney in a criminal case is held to a higher standard; in his role as "a minister of justice" and "spokesperson for the state, an entity whose goal is to see justice done," a prosecutor has a "specific obligation[] to see that the defendant is accorded procedural justice, [and] that guilt is decided upon the basis of sufficient evidence," rather than bias or prejudice.  Ariz. R. Sup. Ct. 42, ER 3.8 cmt.1; *State v. Dansdill*, 246 Ariz. 593, 602, ¶ 31 (App. 2019).  Thus, the primary duty of a lawyer engaged in public prosecution is not to convict, but to see justice done.  The importance of these obligations cannot be understated "because legal institutions in a constitutional democracy depend on popular participation and support to maintain their authority."  Ariz. R. Sup. Ct. 42, pmbl. 6.

¶82        Yet, here we are, confronted with a prosecutor whose repeated misconduct toward the superior court, other attorneys, principals, and witnesses in a criminal case was not only abhorrent to the rules of professional conduct — and clearly unnecessary to obtain a conviction — but broadcast over and over again, hour after hour each day, throughout a sixty-seven-day trial and the non-stop hours of nationwide media coverage that followed.

¶83        The prosecutor's behavior throughout this trial was a clear abuse of his ethical duties, its scope and extent now exposed and quantified through the filing of this opinion.  With that, our prior supreme court decisions direct us to simply report the wayward prosecutor to the State

Bar for possible sanctions. *State v. Towery*, 186 Ariz. 168, 185 (1996) (citation omitted). The Court does so; nevertheless, I am left dissatisfied by the serious questions raised by the prosecutor's misconduct, which has previously been raised with the State Bar yet remains unanswered for.

¶84 Does a criminal defendant's ill-advised contact with the media open the door to the proverbial circus that occurred in this case? Are we permitted to suspend and abuse the Rules of Professional Conduct so long as a defendant's guilt is overwhelming? Should every attorney, venireperson, lay witness, and member of the public that appears in a criminal court be prepared to confront and be confronted by sarcasm, innuendo, and derision? Should highly educated, credentialed, and respected professionals expect to be bombarded with baseless claims of unprofessional and salacious conduct in the course of presenting their expert opinions? Or, is basic courtroom respect, demeanor and decorum simply dead? Can we no longer rely upon the members of the legal profession to self-regulate through personal conscience and the approbation of professional peers? And, what tools do our trial judges require to corral self-interest and out-of-control egos that undermine one hundred years of effort by this State's legal profession to foster a sense of integrity and propriety in the decisions of our limited-jurisdiction, superior, and appellate courts?

¶85 While I am comforted by the fact that the jury, presented with the evidence and properly instructed, was able to see past the sickening, childish conduct of the State's attorney, perform their duties as sworn, and apply their common sense and understanding to the task at hand, this is no substitute for the professional responsibility each lawyer must exercise when appearing in any Arizona court. With the issue of the propriety of Arias' conviction now having been put to rest, and the conduct of the prosecutor having been reported, I am hopeful that the viability and enforceability of our Rules of Professional Conduct will be reasserted and legitimized such that we, Arizona's attorneys, judges, and courts, can be back about the business of pursuing justice in the manner Arizonans have a right to expect.

AMY M. WOOD • Clerk of the Court
FILED: AA